[No. 10,705—In Bank.]
July 28, 1882.

## THE PEOPLE v. CLARENCE GRAY.

MURDER—DYING DECLARATION.—The rule is settled in this State that dying declarations, in order to be admissible, must have been made when an undoubting belief existed in the mind of the declarant that the finger of death was upon him, and all hope of recovery was gone. If it appears in any mode that there was a hope of recovery, however faint, still existing in the mind of the declarant, the declaration is not admissible.

ID.—ID.—EVIDENCE.—As to the proof of the existence of the sense of impending death, it may be gathered from any circumstance or from all the circumstances of the case. It need not be proved by the express statements of the declarant that such belief exists.

ID.—ID.—ID.—In this case, held, under the rule above stated, that the dying declarations of the deceased, admitted in evidence, were properly admitted.

MISCONDUCT OF JURY—AFFIDAVIT OF JUROR.—An affidavit of a juror is not admissible to impeach a verdict.

ID.—ID.—NEW TRIAL.—During the trial, large amounts of beer, wine, and whisky were procured, at their own expense, and consumed by the jury, without the permission of the Court, or the consent of the defendant, and without the knowledge of either of them.

Held: This was such improper conduct upon the part of the jury as to require a new trial.

APPEAL from a judgment of conviction, from an order denying a new trial, from an order denying a motion in arrest of judgment, and from an order denying a motion to set aside the indictment in the Superior Court of the County of San Mateo. HEAD, J.

R. B. Canfield, W. T. Wallace, Fox & Ross, and Garber, Thornton & Bishop, for Appellant.

A. L. Hart, Attorney General, R. G. Rowley, District Attorney, B. F. Thomas, and C. T. Jones, for Respondents.

THORNTON, J.:

The defendant was indicted for the murder of one Glancey, and convicted of murder in the second degree. He moved for a new trial, which was denied, and this appeal is prosecuted by him from the judgment and the order denying his motion above mentioned. On the trial many points were re-

served to the ruling of the learned Judge of the Court below, which have been elaborately argued in this Court, and which we are called on to determine.

It appears from the bill of exceptions that defendant challenged two of the grand jurors (Hagan and Simpson), who participated in finding the indictment against him; the challenges were denied, and exceptions were reserved to the ruling. Defendant also moved to set aside the indictment as not found as prescribed by the Penal Code. This motion was denied and defendant excepted. These challenges were made on the ground mentioned in subdivision six (6) of Section 893 of the Penal Code. We have examined the testimony on which the challenges were made, and are of opinion that they were properly disallowed. There was no evidence that the grand jurors who were challenged would not act impartially and fairly in acting upon the matters submitted to them. (Penal Code, § 896, Subd. 6.) The indictment was properly found. (*People* v. *Southwell*, 46 Cal. 141; *People* v. *Colby*, 54 id. 38). There is no evidence that it was not found by the constitutional number—twelve. (See cases just cited, and *People* v. *Hunter*, 54 Cal. 65.)

The Court below admitted certain declarations of the deceased (Glancey) as made under a sense of impending death, and this is assigned as error. There was much testimony as to these declarations, which it is proper to examine. Glancey received the wound of which he died about two o'clock in the afternoon of the 25th day of September, 1880. This wound was inflicted by a pistol shot. He died about nine o'clock on the next day. Two physicians were called and testified as to Glancey's condition and the state of his mind during his illness, and at or about the time when the declarations which were admitted by the Court were made.

Dr. C. B. Bates was first called. He testified that the base of the wrist of the right arm was fractured by the shot, and that the bullet passed through the stomach, and was necessarily mortal; that he found a ball lying beneath the skin about eight or nine inches from the wound, in front and on the left side, just above the hip-bone, and that he removed the ball. He further stated that it was near half-past two in the afternoon of the twenty-fifth of September when he first saw Glan-

cey. He was then lying on a table in the Morris House. The witness proceeded as follows:

"Almost the first words Glancey said when I first saw him were 'that he wished to telegraph for his wife if I thought the wound was a serious one.' I told him he had better do so. I then told him, looking upon the wound superficially, that I thought it was possible the ball might have slipped around the muscles without penetrating the cavity of the abdomen: if so, he might recover; but that we must wait. I can not give the exact language that Glancey used, but the impression which his language made on me at the time was that he thought he was going to die, and he wanted his wife there."

"Mr. Jones. Doctor, we want you to give his language as near as you can recollect it in substance.

"Answer. I have done so.

"Question. When he made this statement to you about telegraphing to his wife, what reply did you make to him?

"A. I said you had better telegraph. I was frequently with Glancey from the time of first being called in, that is, running in and out, sometimes an hour between my visits, sometimes longer; about half-past four o'clock in the afternoon of the shooting I went there and found that he had been vomiting blood, that indicated that there was some perforation of the cavity of the abdomen, and I told him it was a very serious symptom. I told him that the vomit contained blood, that showed that there was very serious internal injury. He said that he was aware of it, that he had seen such wounds in the war, and he knew the gravity of the symptom. Nothing more was said at the time on the subject. I recollect of something being done in regard to fixing up his business affairs; it is my impression now that his deposition was taken before I told him that the wound was a fatal one. I mean his written deposition.

"Q. What, if anything, did you say to him before that was done in regard to his business matters and his condition?

"A. I don't think that I said anything to him. I must admit that I am a little confused about the time that this deposition was taken; my impression has been, and the evidence that I gave on the former trial has been, that it was taken

after I told him that the wound was probably a fatal one, but I believe that I was mistaken in that, that it was taken before I told him. If so, I had no conversation with him previous to this deposition.

"Q. You mean the written deposition?

"A. The written deposition."

On cross-examination, Dr. Bates testified:

"I saw Glancey at intervals during the night and upon the following morning. The next mention made to him by me as to his condition was on the following morning from seven to half-past seven o'clock. I went in to see him; he said he felt very much better, was free from pain, and thought he might pull through. I then examined his pulse, found that he was dying, and told him so. He said if that was so he would like to have a cup of tea and dictate a letter to his wife. He died within an hour and a half or two hours after that. At the time he made this remark about feeling better, Mr. Lloyd, a young man who was taking care of him, was present.

"Q. Have you given his exact language at that time?

"A. As nearly as I can remember; but it is so long ago that I—

"Q. (Interrupting.) He told you that he was free from pain?

"A. Yes, sir.

"Q. And you took hold of his pulse at that time and found that he was dying?

"A. Yes sir, and found that he was pulseless.

"Q. Pulseless at the time he made this remark?

"A. Yes.

"Q. And you informed him that he was dying?

"A. Yes sir."

Dr. B. F. Winchester was then called and testified as follows:

"I am a physician and surgeon, a graduate of a regular medical institute, Bowdoin College, Maine. I lived at Santa Barbara in September last year. I was not acquainted with Theodore Glancey in his life-time. I saw Theodore Glancey on the twenty-fifth of September last, after the shooting, first in the office of the Morris House; there was quite a large company around him. I found that he was wounded in the abdomen. Afterwards he was removed to a room in the ho-

tel; I there made a more careful examination of his condition.
I found an injury of the right forearm, the ball passing
through the wrist about one inch above the wrist joint, the
wound on the inside of the arm being a little higher than
that on the outside. At that place the radial artery of the
arm was severed, and the abdomen was injured as described
by Doctor Bates. The wound was naturally a mortal one. I
did not state to him its nature at that time. He asked me
at one time the nature of the wound, and believing that it
might be better for him not to know it, I evaded the answer.
There was great depression at first, but after he was completely
under the influence of an opiate his condition was somewhat
better, and I made that remark in his presence. There was
not so much prostration; there seemed to be a little reaction,
and he inferred from that, I judge what he said, that I had
some favorable idea of his case, and he asked me if I thought
that he would recover; something to that effect, and I told him
that his condition seemed to be more favorable, and we hoped
there might be a chance for his recovery. That was, I think,
three or four hours after the injury was received. I saw him
after that. I was there after he had vomited blood, but I do
not remember any conversation in his presence then.

"After he found that he had been vomiting blood he gave up
all hope. He said there was no possibility of his recovery. I
heard him make an expression of that kind. I can not repeat
the words, but I know the effect upon my own mind that he
was convinced from that time that he could not recover. This
is not an impression. It is something that I know most ab-
solutely. After that I spoke freely to those about him about
his condition. I remember that I had no further reserve be-
cause I was satisfied from the remark he made that he knew
he was going to die. He made a remark about his being in
the army, and knowing the nature of such wounds and he
was convinced his chances of recovery were very small, or
something to that effect, to which I made no answer; that
was before he vomited the blood, and at the time I made the
careful examination of his case. From the time he made
this remark which indicated that he had given up all hopes,
I did not at any time hear him say anything that indicated
that he had changed his mind as to his condition. I was

present at the post-mortem examination. The gun-shot injury of the abdomen was the cause of the death of the deceased. The wounds were of such a nature that they might have been made with one ball. I can not fix positively the time when deceased expectorated the blood, I should say it was between four and five o'clock.

"Q. Were you present when a written statement was made by deceased?

"A. I only knew that something was being taken down in writing. The writing had been done and he was asked to sign it; he tried to raise his right arm to use it. I told him not to use it, to try the left hand, and I supported the arm while he made his signature with the left hand: and I remember his asking at that time whether the signature was legible. I knew nothing of the paper. Don't know whether it was a will or a statement. I am quite positive this was after he had vomited the blood."

On cross-examination of this witness, he said:

"I think an opiate was given him almost immediately, but it took some hours before he was quieted by it, and there was evidence of slight reaction. I made the remark at the time that I noticed that there was a slight reaction; that his condition was more favorable. It was then that he wanted to know whether I entertained any hope of his recovery, and I gave an evasive answer by telling him that certainly his condition was more favorable than it had been. On the former trial of this cause at Santa Barbara I testified that he asked me at one time what I thought of his condition. That was two or three hours after he was placed under the influence of opiates, and he made the remark that he was better, and he asked me then if I had hopes of his recovery, and I evaded the answer. I told him there was a possibility of his recovery; we hoped there was.' I cannot tell what time in the evening this statement was made. I think it was just about dark or a little before. I do not remember if the lights were lit at that time. I have a remembrance of some one bringing in a light at the time the signature was made, and believe that to be the time now; no, it was not, it was before, because he was very weak then; it was before the lights were lit when that occurred. I don't know whether I testified on

the former trial that it was after the lights were lit; what I told then was the truth; my recollection might be more clear then than it is now."

"Defendant's counsel then read to witness from the report of his testimony taken at the former trial, the following questions and answers immediately following that portion of the testimony of the witness on said former trial last above quoted :"

"Q.  Did he make any reply to information?

"A.  Yes, sir, he thought it was doubtful.

"Q.  Do you remember the time of day or night you gave him this information?

"A.  It was in the evening.

"Q.  What hour?

"A.  After the lights were lit."

"And witness testified that that was the testimony he gave at the former trial, he believed it was, and said: Well, the lights might have been lit, but I don't think there was a light in that room, because I remember the fact of some one bringing in lights afterwards when I held his hand.  I think both bones of the wrist were shattered.  That is, the radius was comminuted, the ulna was not so completely broken but that it could support itself.  So far as I know, Glancey was in good general health.  His body was well nourished.  He was about five feet eleven inches in height."

John F. Stearns testified also as to Glancey's condition and state of mind.  Stearns said:

"I found Mr. Glancey lying on the table in the Morris House in the reading-room, they were just taking his clothes down to look for the wound on his body.  He was there a few minutes, and they moved him to a room on the next floor above.  I assisted in taking him up.  I went to the *Press* office for the purpose of reporting the matter to the Associated Press.  The first I recollect of seeing when I returned to Mr. Glancey, about three o'clock or half-past three o'clock, I found Judge Hatch writing, or at least reading, when I returned at that time.  Mr. Glancey asked the physician what his condition was, if there was any probability of his recovery.  He had in the mean time requested some one to write a telegram to his wife if the Doctor thought he could not

survive, to get her there as quick as possible, and he had dictated the telegram, it had been sent when I reached there. I staid by him probably an hour, and in the mean time he vomited blood, as near as I can recollect from half a pint to a pint. I had been trying to encourage him, the probabilities were that he would get well, and tried to keep his spirits up as much as I could; but after vomiting the blood he said he felt easier. I then attempted to encourage him again; he had been a lieutenant in the army during the war, and had a good deal of experience with gunshot wounds, and he said, Mr. Stearns, I am too well acquainted with gunshot wounds not to know that my case is fatal. I am shot through the stomach or the intestines, so that the blood flows into it, and a man never survives such a wound. And I saw there was no use trying to encourage him, he would receive no encouragement, and I staid as long as I could. I returned to the *Press* office and then returned to Mr. Glancey again, and was backwards and forth in attendance on him probably every fifteen or twenty minutes for an hour or two after. After I returned he seemed in about the same condition, suffering severely from the wound.

"I went to my supper about six o'clock. I returned at about seven or half-past seven. I understood from the doctors that his case was mortal, and I went to his room; Glancey extended his hand and I took him by the hand, and his hand was very cold. I stated that they had telegraphed for his wife, etc., and he asked me when it was possible for her to reach there, and I told him that it would be impossible for her to reach there before Monday night, and, perhaps not till Tuesday night. He says : 'Oh, Mr. Stearns, I am dying without seeing my dear little girl-wife. I have spoken to Judge Hatch to write my will and he left me to get some paper. Can you write it for me ?' He continued : 'I feel as though I was sinking and could not last long, and I am afraid I can not stand it for him to return. If you think that you can write it so it would be safe I want you to do it.' I told him I would do it, and immediately arose. They had not lit up his room yet; it was quite dark; past twilight. I went to the office and got paper and ink, ordered the lights at the same time and returned to his room, and the landlord, Mr.

Swift, came up soon and he said the mosquitos were so bad here I better put up mosquito bars before I bring the light in. I presume he was half an hour in putting up the bars and getting a light. In the meantime I was talking with Mr. Glancey; he told me that he was afraid he would not last long, and wanted I should hurry about that will, and, in the meantime I entered into a conversation with him, and I told him that I wanted him to make a statement to me as to the circumstances connected with his difficulty and Gray's. Mr. Tibbetts and Mr. Swift were present at the time, and he went on to state the circumstances of the difficulty with Gray, of the shooting that day. He, Glancey, told me that the doctor had said that if he had anything to do to prepare for death he had better do it, as he could not last long, and he said, says he, ' from my feelings I am satisfied I am dying.'"

The witness, on his cross-examination, said that the declaration of Glancey was made to him between seven and eight o'clock in the evening of the twenty-fifth of September. The witness was then asked to give the statement which Glancey made to him as to the shooting, when the counsel for defendant objected, on the ground that it was not made under a sense of impending death, and when the declarant was without hope of recovery; and further, that in the morning after the declarations were made, deceased said he felt a great deal better, and thought he might pull through. The admissibility of the statement as a dying declaration was then argued by counsel for defendant, and at its close they proposed to call Dr. Bates for the defense, which the Court allowed. The following is the testimony of Bates then given:

" Q. In the morning, when you saw Mr. Glancey, and when he said he felt much better and thought he might pull through, or words to that effect, what was his mental condition ?

"A. Perfectly collected and sound.

" Q. His mind entirely clear ?

" A. Perfectly so.

" Q. And reasonable ?

"A. And reasonable; yes, sir, and so continued up to within a few moments of his death.

" Q. By the Court: How do you explain this feeling of ease at that time; what was the cause of it ?

"A. It was the nearness of death—he had ceased to feel.

"·Q. By Mr. Jones: Doctor, do you recollect with distinctness the expression that Glancey made use of, on the occasion you have spoken about; are you sure you gave the exact language?

· "A. It was the impression that he conveyed to me. I testified on this point at the preliminary examination before the magistrate. I believe my testimony was the same then as it is now.

" Q. By Mr. Thomas: Didn't you testify in this way: that Mr. Glancey said to you, 'If I were to judge from my own feelings, I think I might pull through,' or something to that effect, 'but I know I can not'?

· " Mr. Thornton objected.

" The Court: Well, let us have the testimony (whereupon, the written testimony of Doctor Bates was sent for.)

" Q. You now remember his language, Doctor?

· "A. Not verbatim, sir; it is only my impression. Mr. Lloyd was present in the room at the time. I think Mr. Swift was not present. It was my impression Mr. Lloyd was the only one there."

It appears from the bill of exceptions that the report of the testimony of the witness at the former trial of this case, and the preliminary examination before the magistrate, was then produced, and were examined by the counsel for the prosecution, and· they admitted that his testimony on those occasions was the same as his testimony given now, as to the conversation·with Glancey, on the morning of his death. The witness was further examined as follows:

" By Mr. Thornton, to the Court: I would like to refresh his memory, by asking him what he swore to at the former trial, a day or two after the accident, and ask him, if it was not likely that it was fresher in his memory then, than now?

" By the Court: If he remembers what he swore to.

"A. (Witness interrupting.) It is impossible for any one to remember every word that was spoken under such circumstances. I remember the general impression that was given to me at the time. I remember the impression that he gave me; that is, that he was so comfortable that he should think

that he might get well; that was before I told him that he was pulseless, and would soon die."

At a point in the examination of Dr. Bates just detailed, when the report of his testimony previously given was sent for, the Court, on the request of the prosecution, allowed one Marion Lloyd to be called, and he gave the following testimony:

"I am a painter by trade, am a man of family, and reside in Santa Barbara. I was acquainted with Theodore Glancey in his life-time, was acquainted with Clarence Gray previous to the homicide; our relations were friendly. On the night of the twenty-fifth of September last, I was with Mr. Glancey all night. I sat up with him till the time of his death. I was present in the morning when Dr. Bates came to see Mr. Glancey a couple of hours before he died.

" Q. State now what occurred between the doctor and Mr. Glancey when the doctor came in.

"A. The doctor came in and felt of his pulse and said: ' Glancey, I have told you when the change took place they would notify you; or that I would tell you,' and said: ' If you have any business to settle up or anything, I say you had better do it because you have not long to live,' or something to that effect. In answer to this Glancey said: ' If I were to judge from my feelings, I would pull through, but I know that I can not.' I am certain this was the expression. I went to his place about nine o'clock in the night. I think I was with him from that time up to the time of his death.

" Q. Now, during that time, from nine o'clock in the night up to the time of his death, state to the Court if there was any expression that he made use of that indicated that he had any hope of life ?

"A. There was no time from the time I first saw him to the time of his death that he made any expression of hope or believed that he would recover."

On his cross-examination Marion Lloyd testified:

" The first thing Dr. Bates said after he entered the room was, putting his hand on Glancey's pulse and turning to me, ' the man is dying, he won't live an hour.' That was the first thing he said; then he told Glancey if he had any business to attend to that he had better do it, for he would not last

much longer; if he had any unsettled business he had better arrange it."

The Court here allowed Stearns to testify as to the statement, to which ruling defendant, by his counsel, excepted.

The question as to the circumstances under which dying declarations are admissible was considered by this Court in Bank in *The People* v. *Hodgdon* (55 Cal. 76). It was also considered by Department Two of this Court in *People* v. *Taylor,* 59 Cal. 640. Of this case last cited, it may be further remarked that there was a petition for rehearing, that the ruling as to the dying declarations was the main point discussed in the petition, and the rehearing was denied by the Court in Bank. These rulings are in accord with the previous decisions of the highest Court of this State, and with the current of decisions in all the Courts where the common law is administered.

The rule as settled by the foregoing decisions on this point is as follows:

1. The declarations must have been made when an undoubting belief existed in the mind of the declarant that the finger of death was upon him, that all hope of recovery was gone. If it appears in any mode that there was a hope of recovery, however faint, still existing in the mind of the declarant, the declaration is not admissible.

2. As to the proof of the existence of the sense of impending death, it may be gathered from any circumstance or from all the circumstances of the case. It need not be proved by the express statement of the declarant that such belief exists. "It is enough," says Mr. Greenleaf on the subject of the admissibility of such declarations, "if it satisfactorily appears in any mode, that they were made under that sanction; whether it be directly proved by the express language of the declarant or be inferred from his evident danger, or the opinions of the medical or other attendants stated to him, or from his conduct, or other circumstances of the case, all of which are resorted to, in order to ascertain the state of the declarant's mind." (1 Greenl. Ev., § 158; *People* v. *Taylor, supra.*) Guided by these rules, we proceed to examine the testimony above detailed, which was before the Court when the ruling under consideration was made.

We refer first to Dr. Winchester's testimony. It appears from it that some time in the afternoon or evening of the day on which Glancey received his wound he vomited blood. "After he found that he had been vomiting blood," says Dr. Winchester, " he gave up all hope; he said *there was no possibility* of his recovery. I heard him make an expression of that kind. I cannot repeat the words, but I know the effect upon my own mind that he was convinced from that time that he could not recover. This is not an impression. It is something that I know most absolutely. After that I spoke freely to those about him about his condition. I remember that I had no further reserve, because I was satisfied from the remark he made that he knew he was going to die. He made a remark about his being in the army, and knowing the nature of such wounds and that he was convinced his chances of recovery were very small, or something to that effect—to which I made no answer; that was before he vomited the the blood, and at the time I made the careful examination of his case. From the time he made this remark which indicated that he had given up all hopes, I did not at any time hear him say anything that indicated that he had changed his mind as to his condition." He further stated that it was between four or five o'clock when he expectorated the blood.

Stearns reached Glancey soon after he was wounded. He found him lying on a table in the reading-room of the Morris House, and they were just taking his clothes down to look for the wound in his body. He (Stearns) left him and returned about three o'clock. This witness further stated: " I stayed by him probably an hour, and in the mean time he vomited blood, as near as I can recollect from half a pint to a pint. I had been trying to encourage him, the probabilities were he would get well, and tried to keep his spirits up as much as I could, but after vomiting the blood he said he felt easier. I then attempted to encourage him again; he had been a lieutenant in the army during the war, and had a great deal of experience with gunshot wounds, and he said: ' Mr. Stearns, I am too well acquainted with gunshot wounds not to know my case is fatal. I am shot through the stomach or the intestines, so that the blood flows into it, and a man never survives such a wound.' And I saw there was no use trying

to encourage him; he would receive no encouragement." When Stearns saw him about seven or half-past seven, he then understood from the doctors that his case was mortal; he then went to his room. "Glancey extended his hand, and I took him by the hand, and his hand was very cold. I stated to him that they had telegraphed for his wife, etc., and he asked me when it was possible for her to reach there, and I told him that it would be impossible for her to reach there before Monday night, and perhaps not until Tuesday night. He says, " O, Mr. Stearns, I am dying without seeing my dear little girl wife. I have spoken to Judge Hatch to write my will, and he left me to get some paper; can you write it for me ? I feel as though I was sinking and could not last long, and I am afraid I can not stand it for him to return." Afterwards he said that Glancey "told me he was afraid he would not last long, and wanted I should hurry about that will." Further: "He, Glancey, told me that the Doctor had said that if he had anything to do to prepare for death, he had better do it, as he could not last long, and he said, " from my feelings I am satisfied I am dying." The declarations offered were made between seven or eight o'clock, and afterwards the will was written.

The foregoing testimony clearly shows that the offered declaration was made under a sense of impending death, and that the Court ruled correctly in admitting it.

We do not think that the remark testified to by Dr. Bates, made about seven o'clock on the morning of the next day (twenty-sixth of September), shows the ruling erroneous, when we view it in connection with the testimony of Lloyd, detailing what passed between Dr. Bates and Glancey. The Doctor, according to Lloyd, told Glancey he had not long to live, and, in reply, Glancey made the remark: "If I were to judge from my feelings I would pull through, but I know that I can not."

As to the verity of the report of Glancey's remarks, which witness (Dr. Bates or Lloyd) gave it accurately, the Court below was to judge, and we can not say that any error was committed by the Court, if it accepted Lloyd's statement as the accurate and reliable. In saying this we do not intend

to cast any reflection on the credibility of Dr. Bates, who seems to have been a very careful and cautious witness. Nor could it have been so intended by the learned judge. He only gave the greater credit to the accuracy of Lloyd's memory. If this remark of Glancey as given by Dr. Bates shows hope, his testimony, as previously stated, sustains the testimony of Winchester and Stearns as to Glancey's belief that his death was impending. Reference is here made to the portion of his testimony which follows: "I can not give the exact language which Glancey used, but the impression which his language made on me at the time, my impression at that time, was that he thought that he was going to die and he wanted his wife there."

"Mr. Jones: Doctor, we want you to give his language as near as you can recollect it in substance ?

"A. I have done so."

As we understand this, the witness certainly intended to say that his language was in substance that he was *going to die.*

The remark of Glancey as given by Dr. Bates, made on the morning of the twenty-sixth of September, just before his death, that he felt very much better, was free from pain, and thought he "might pull through," is not sufficient to repel the conclusion that the declaration previously made, was made under a sense of impending death, and when all hope of recovery was gone. To authorize the Court below to reject the declaration offered, the learned Judge must have been satisfied from the remark above quoted, taken together with all the circumstances of the case, that when the declaration in question was made that there was some hope of recovery in the mind of declarant. The effect of the frequent declarations previously made showing no hope of life can not be displaced by the single declaration testified to by Dr. Bates. (See *Swisher's case,* 26 Gratt. 963.)

This witness was again called, and gave further testimony germane to the question under consideration. George B. Tibbetts was called, and testified as to the same matter. Tibbetts said : "I was present at the Morris House on the evening following the shooting, when Mr. Glancey made some statement, some dying statement, to Mr. Stearns, between seven and eight

o'clock in the evening.  Glancey asked me to feel his pulse.
I took hold of his pulse, and said to him that it seemed to be
better, a little fuller, or something like that; and he made the
remark that he could not live; that the doctor has just told
him that he could not live.  He was afraid that he could not
live.  About that time, I think—perhaps before he made that
remark—Mr. Stearns stepped into the door, and I got up and
gave him my seat, and I walked around the bed."  (Witness
then repeated the statement of the deceased substantially as
given by the witness, J. P. Stearns.)

"Q. Was that all that was said, as far as you remember?

"A. He mentioned several times—at that time he said he
could not live—mentioned that he would like to see his little
wife, child wife, or little wife, I think was the expression that
he used several times."

Lloyd, on being recalled, said: "I have lived in Santa Bar-
bara eight years.  I knew Theodore Glancey; had known
him since a little boy.  I was raised in the same town with
him.  On the night of the twenty-fifth of September, it was
about nine o'clock that I first saw Glancey.  I stayed all night
with him.  He stated at different times that he would not live.

"Q. How did he come to speak about it?

"A. Once he spoke of his wife, and said he wished she was
there.  I asked him if he had sent for his wife.  He said,
'Yes, I have telegraphed for her, but she will not get here in
time to see me alive.'  That was about ten o'clock; I think
an hour, probably, after I went in.

"Q. What else did he say?

"A. I said to him, she may come yet; and he repeated
again, that he could not stand it long; and another time he
exclaimed, 'I'm dying; can't you help me?'  Then, 'My God,
I am dying.'  'My God; my poor wife; what a blow this will
be to her,' at different times.  He at one time threw his hand
on his breast, in this manner [illustrating], exclaimed: 'This
is killing me,' and said 'can't you help me?' and called for
water.  I gave it to him, and laid him down on the bed.  The
gurgling of the blood through the wound made a noise which
he heard, and he said, 'Did you hear that?'  I said no; and
he asked me to look, and said he felt the blood running.  I
looked at the wound, and told him it wasn't bleeding.  He

said that he felt the blood running. He said: 'I know this wound is fatal.' I think it was between twelve and one o'clock that night, as near as I can remember, that Glancey made a statement to me in regard to the manner in which he was wounded, and the person who inflicted the wound. Just before this, I told him that I knew nothing about the facts of the affair at all, and I would like to have him tell me just how it occurred; and he commenced by saying——

Counsel for defense here first asked to cross-examine witness.

Cross-examination by defense: "The expressions that I have made use of as coming from Glancey referring to his physical condition and his chances of recovery, were made by him before twelve o'clock, before the time when he gave me the account of the affair. I was there from nine o'clock all night up to the time of his death, Sunday morning about nine o'clock."

Tibbetts, after giving his testimony as above quoted, deposed to the same statement substantially as that given by Stearns, as did Lloyd, with some omissions not here necessary to be stated, as they do not affect the admissibility of the declaration. The same objection was made to these statements and exception. It is not necessary to say anything more on this exception than what has been said above. The declarations were in our judgment made under circumstances justifying their admission, and no error appears in the ruling letting them in.

It is also contended that the homicide of Glancey by the defendant was justifiable, that the killing was in self-defense; and as to this defense our attention is called to certain instructions in relation to it, given at the request of the prosecution, and particularly to the twenty-sixth instruction so given. This instruction is substantially the same as that held erroneous by the majority of this Court in Bank in *People* v. *Flahave*, 58 Cal. 249, and by two of the Justices in *People* v. *Simons*, 60 id. 72.

The instruction as given by the Court is in these words: "A bare fear that a man's life or limb is in danger is not sufficient to justify a killing, but in order to justify a man in taking the life of another in self-defense, the circumstances

must be sufficient to excite the fears of a reasonable man, and the party killing must have acted under the influence of such fears alone. To justify a person in killing another in self-defense, it must appear that the danger was so urgent and pressing that in order to save his own life, or to prevent his receiving great bodily harm, the killing of the other was absolutely necessary; and it must appear, also, that the person killed was the assailant, or that the slayer had in good faith endeavored to decline any further struggle before the mortal blow was given."

According to the ruling in *People* v. *Flahave*, this instruction was erroneous. But as to this defense, the Court likewise instructed the jury as follows: "If the defendant believed himself to be threatened with danger he was justified in determining from appearance and the actual state of things surrounding him, as to the necessity of resorting to self-defense, and if he acted from reasonable and honest convictions he can not be held criminally responsible for a mistake in the actual extent of the danger when other judicious men would have been alike mistaken."

"If the defendant, without fault on his part, was assaulted by the deceased in such a manner as to induce in him a reasonable and well-grounded belief that he was actually in danger of losing his life, or suffering great bodily harm, when acting under the evidence of such reasonable apprehension, he was justified in defending himself, whether the danger was real or only apparent."

"If the jury find, from the evidence in the case, according as charged by the Court, that the defendant would have been justified in firing the pistol shot at the deceased; if the deceased was armed with a pistol, and they find that the defendant had reasonable ground to apprehend and did apprehend that the deceased was armed with a pistol, it makes no difference whether in fact the deceased had a pistol or not."

"It makes no difference in this case whether the deceased was armed or unarmed, if the defendant had reasonable grounds to believe, and did believe that he was armed. In order, however, for the defendant to be justified in acting upon the appearances, the circumstances must have been such as to excite the fears of a reasonable man."

These instructions must have been intended to qualify the instructions previously quoted. And by them, the Court intended to say to the jury that though it is said in the former instruction that to make out such defense it must appear that the danger is so urgent and pressing that in order to save his own life or prevent his receiving great bodily harm, the killing of the deceased was absolutely necessary, still he might act on appearances, and if the circumstances appearing in evidence were such as to induce in the defendant a reasonable and well-grounded belief that he was actually in danger of losing his life or suffering great bodily harm, he was justified in defending himself, even to the taking of the life of the deceased, though the danger was only apparent. The rule as to appearances was fully and correctly set forth in the four instructions just above quoted—the first two covering the defense in its entirety, the two last as to the question whether the deceased was armed or not.

The Court said, in *People* v. *Doyell,* 48 Cal. 85 : "We must take the charge together, and if, without straining any portion of the language, it harmonizes as a whole, and fairly and correctly presents the law bearing on the issues tried, we will not disturb the judgment because a separate instruction does not contain all the conditions and limitations which are to be gathered from the entire text.

"It is true that an error which might affect the defendant will be presumed to have injured him; but another presumption is, that jurors are men of common intelligence, and capable of comprehending the ordinary use of language, as applied to the particular proposition under consideration, and in reference to which it is employed. We will not assume that the jurymen may not have understood the charge as we understand it." (See *People* v. *Bagnell,* 31 Cal. 409 ; *People* v. *Dennis,* 39 id. 625.)

We do not think the language of any portion of the instructions is strained by the construction we have put on them. In this view, we do not think that any error was committed which prejudiced the defendant. As the jurors must be presumed to have been men of common intelligence, and capable of comprehending the ordinary use of language, we can not conclude that they were misled, or that they did not compre-

hend the rule as to apparent danger, which was so clearly presented to them in the instructions above quoted. We have examined the other rulings to which exceptions were reserved, and find no error in them.

One of the grounds on which a new trial was asked for, was "misconduct of the jury, by which a fair and due consideration of the case was prevented." As to this, there was much evidence in the shape of affidavits presented by the prosecution and defense. Some of the affidavits offered by the defense, were made by certain of the jurors. They were of a character to impeach their verdict, and were certainly incompetent as testimony. In passing on this point, we shall not take into consideration such affidavits.

We shall not discuss the evidence in detail. It would uselessly lengthen this opinion, already longer than is desirable. We shall content ourselves by stating what we think is established by sufficient evidence. Such are the facts as established:

The trial commenced on the first day of June, 1881, and terminated on the morning of the twelfth of the same month, about nine o'clock, when the jury rendered the verdict and were discharged. The jury was fully impaneled on the evening of the third of June, some time after six o'clock. As soon as the jury was complete, they were, by the order of the Court, placed in charge of the Sheriff, and instructed as to their duties. They remained in charge of the Sheriff, not being allowed to separate until they were discharged on the morning of the twelfth. After the jury was complete, and before the cause was submitted to them on the afternoon of the eleventh of June, about five o'clock, a period of about eight days, four five-gallon kegs of beer were brought into the room at the Tremont House, where the jury was kept by the Sheriff, of which about seventeen and a half gallons (of the beer) were drank by them; that during the same period a two-gallon demijohn of wine was brought in and drank by them; that during the same period some of the jurors drank claret wine, amounting to three bottles, at their meals, while some of them drank whisky at their meals; that all this drinking was done before the cause was submitted to them on the afternoon of the eleventh of June; that on the eleventh

of June, during the noon recess, two of the jurors procured each a flask of whisky; that one of the jurors (Price, the foreman) drank nothing. That all the drinking by the jurors was without the permission of the Court, or the consent of the defendant, or of the counsel engaged in the cause, and in fact without the knowledge of either of them; that all the beer, wine, and whisky drank was procured by such of the jurors as desired it of their own motion and at their own expense; that the verdict was agreed on about eight and a half o'clock on the morning of the twelfth.

Further, the evidence affords strong reason to suspect that one of the jurors drank so much while deliberating on the verdict as to unfit him for the proper discharge of his duty.

The decisions as to how far drinking by a juror while in the discharge of his duties as such, at his own expense, without the permission of the Court, or the consent of the party, is such misbehavior that the verdict should be set aside and a new trial granted, are not uniform. In Iowa and Texas no drinking at all is allowed. (See *State* v. *Baldy,* 17 Iowa, 39; *Ryan* v. *Harrow,* 27 id. 494; *Jones* v. *State,* 13 Tex. 168.) It is held in these cases that if any liquor is drank while the juror is in the discharge of his duties, the verdict can not stand. In each of the cases cited the drinking was done after the cause was submitted to the jury to deliberate on their verdict. In *State* v. *Baldy,* a juror in charge of a bailiff went to a grocery store to purchase some tobacco, and while there drank a glass of ale or lager beer, and then returned with the bailiff to the jury room.

In *Ryan* v. *Harrow,* a civil case, two of the jurors drank intoxicating liquors. In *Jones* v. *State,* the bailiff twice took the jury whisky, which they drank. The verdicts in these cases were set aside. These cases all hold that Courts will not inquire whether the juror was affected by what he drank or not; that the only sure safeguard to the purity and correctness of the verdict is that no drinking shall be allowed. This rule is supported by the following cases: *Davis* v. *The State,* 35 Ind. 496; *Leighton* v. *Sargent,* 31 N. H. 119; *State* v. *Bullard,* 16 N. H. 139; *Pelham* v. *Page,* 6 Ark. 535; *Gregg* v. *McDaniel,* 4 Harr. 367; *People* v. *Douglass,* 4 Cow. 26; S. C., 15 Am. Dec. 332; *Brant* v. *Fowler,* 7 Cow. 562.

The law seems to have been settled in New York to the same effect as in Iowa and Texas, until *Wilson* v. *Abrahams*, 1 Hill, 207, which was a civil case, as its title imports. In that case during the trial and before the cause was submitted to the jury for their consideration, and the jurors were allowed to separate, one of the jurors, during an adjournment for dinner on the second day of the trial, went into a tavern and drank about half a gill of brandy. In the opinion of the Court, Bronson, J., states his conclusion arrived at:

"When in the course of the trial, a juror has in any way come under the influence of the party who afterwards has the verdict, or there is reason to suspect that he has drank so much, at his own expense, as to unfit him for the proper discharge of his duty, or where he has so grossly misbehaved himself in any other respect as to show that he had no just sense of the responsibility of his station, the verdict ought not to stand. But every irregularity which would subject the juror to censure, whether in drinking spirituous liquor, separating from his fellows, or the like, should not overturn the verdict, unless there be some reason to suspect that the irregularity may have had an influence on the final result."

It may well be doubted whether it was the intention of the Court, in *Wilson* v. *Abrahams*, to establish a rule in capital cases different from that held in Iowa and Texas. We express ourselves in this way in consequence of the guarded language of the opinion. The opinion opens by stating the rule in civil cases—and when it comes to remark on the case of *The People* v. *Douglass*, in the 4 Cowen, holding a rule similar to that established in Iowa and Texas, it is said that the case under consideration is distinguished from it, and the feature of distinction first mentioned is that it is a capital case. The cases cited by counsel either follow the rule in the Iowa and Texas cases, or *Wilson* v. *Abrahams*. If any have gone further in a direction opposed to *Ryan* v. *Harrow* and *Jones* v. *State*, above cited, we are not disposed to follow them.

It is not necessary in this case to say which rule should be adopted as the law in this State; but following the rule of *Wilson* v. *Abrahams*, "that where there is reason to suspect that" a juror "has drank so much as to unfit him for

the proper discharge of his duty," the verdict ought not to stand.

In our judgment, there is strong reason to suspect this of one of the jurors, and therefore a new trial should be had.

It should be added here that if it is necessary that intoxicating liquors of any kind should be drank by a juror, application for leave to do so should be made to the Court, who can make such allowance as will be proper. Jurors should not be allowed to judge for themselves in this matter. A defendant in a criminal case should not be called on to consent; and in any case when the party consents, if the juror becomes intoxicated, the verdict should not stand. The purity and correctness of the verdict should be guarded in every way, that the administration of justice should not be subjected to scandal and distrust. For the reason above indicated, the judgment and order are reversed and the cause remanded for a new trial.

MYRICK, J., concurring:

I concur. The evidence contained in the affidavits is conflicting as to whether the juror Winn was intoxicated at the time of the rendition of the verdict, and as the motion for a new trial was denied, the Court below must have concluded that intoxication did not exist. But it is an undisputed fact that beer to the amount of three or four kegs was kept in the juryroom on tap, and was daily used, and that two gallons and three or four bottles of wine, and frequently whisky, was drank. This was such improper conduct on the part of the jury as calls for a reversal of the judgment, based upon the verdict. A jury is to be provided with *suitable and sufficient food*. (Section 1136 Penal Code.) It requires no argument to show that the beer, wine and whisky consumed was not suitable and sufficient food.

McKEE, J., concurred with Mr. Justice MYRICK.

McKINSTRY AND ROSS, JJ., concurring:

We concur in the judgment. When some of the jury, in addition to the "suitable" food furnished by the Sheriff, obtained and consumed fifteen to twenty gallons of beer, two demijohns of wine, two bottles of whisky, and, also, other

wine and whisky at each meal (including *breakfast*). they were guilty of such misconduct as made it the, duty of the Court below to grant a new trial. We also agree that the Court below properly admitted, in evidence, the dying declarations of the deceased.

SHARPSTEIN, J., concurring:

I concur in the conclusion reached by Mr. Justice Thornton, and in the views which he has expressed upon the questions discussed in his opinion, with one exception. . I do not think that the objection to the instruction that "to justify a person in killing another in self-defense, it must appear that the danger was so urgent and pressing that in order to save his own life, or to prevent his receiving great bodily harm, the killing of the deceased was absolutely necessary," was obviated by other instructions, in which the jury were in effect told that a person might be justified in killing another in self-defense even if it did not appear that the danger was so urgent and pressing that in order o prevent his receiving great bodily harm the killing of the deceased was *absolutely* necessary.

It seems to me that the instructions which are said to explain and qualify the one first above referred to are clearly in conflict with it, and if so, the judgment should be reversed on that ground. The Code declares that homicide is justifiable when committed by a person in the lawful defense of himself "when there is reasonable ground to apprehend a design to commit a felony, or to do some great bodily injury, and imminent danger of such design being accomplished." (Pen. C., 197.) If that means that it must appear that the killing of the deceased was *absolutely* necessary to prevent the accomplishment of the design to commit a felony or to do some great bodily injury, the instruction complained of was correct. But it seems to me sufficiently clear that there may be reasonable ground to apprehend a design to commit a felony or to do some great bodily injury and imminent danger of such design being accomplished without its also appearing that the killing of the deceased was *absolutely* necessary to prevent such a consummation.

I think that the introduction of ardent spirits into the jury room while the jury were deliberating upon their verdict, con-

stituted misconduct *per se.* The Sheriff was authorized to provide the jury "with *suitable* and sufficient food and lodging." (Pen. C., 1136.) This is a modification of the old rule which required that they should "be kept without meat or drink, fire or candle, until they agreed." But it is the opinion of at least one text writer that "there has been no relaxation as far as drinking intoxicating liquors is concerned." (Proffatt on Jury Trial, 398.) Whether any juror was so much affected by drinking ardent spirits in the jury room as to temporarily unfit him for the discharge of his duty is not made clear. But it is sufficiently clear that some of them might quite naturally have been more or less under the influence of liquor while deliberating on their verdict, and it seems to me that that is good ground for setting the verdict aside.