[Crim. No. 1801.   Third Dist.   Sept. 18, 1942.]

THE PEOPLE, Respondent, v. GERALDINE WILSON,
Appellant.

Ralph H. Lewis, Sherman C. Wilkie and John L. Brannely for Appellant.

Earl Warren, Attorney General, and J. Q. Brown, Deputy Attorney General, for Respondent.

SCHOTTKY, J. pro tem.—The appellant, Geraldine Wilson, was indicted by the Grand Jury of Sacramento County for the crime of murder, the indictment charging in the usual language that she "did then and there wilfully and unlaw-

fully and feloniously, and with premeditation and malice aforethought, kill and murder one Madeline Rosa, a human being; . . ." After trial by jury she was found guilty of murder in the second degree, the death of Madeline Rosa having occurred on the 4th day of January, 1942, at Sacramento, as a result of peritonitis caused by an incomplete abortion performed upon the decedent on December 22nd, 1941.

It is necessary to a proper understanding of the points hereinafter discussed that we give a brief summary of the evidence as shown by the record. It should be noted at the outset that appellant was charged with the crime of murder occurring on January 4th, 1942, and not with an abortion which, from the evidence, took place on December 22nd, 1941.

Madeline Rosa, the decedent, was a young woman about 24 years of age, and in good health. Prior to December 22nd, 1941, she became pregnant. She had been keeping company with a young man by the name of James G. Matthews, who was a shipyard worker, and whom she had known for about one year. Several days prior to December 22nd, Matthews, who testified he had heard the appellant's voice twice over the telephone that week, talked to appellant on the telephone, another party having placed the call, and asked her if she took care of girls in trouble. Appellant answered, "Yes, that she did". On December 22nd, Matthews took Madeline to the Bank of America, at 8th and J Streets, and then took her out to appellant's residence, which is located at 1062-58th Street in Sacramento. He remained outside in his automobile, and according to his testimony, Madeline went into the residence and remained there about fifteen minutes, and that then he took her to her home in Sacramento. The next day Matthews talked on the telephone to appellant, and we quote from his testimony as follows:

"Q. And what was the conversation with Mrs. Wilson about? State the conversation as near as you can that you had with Mrs. Wilson on that day. A. I called this woman on the phone—I don't remember just now what it was. Q. Where did you get the number? A. From the telephone directory. *And asked for Mrs. Wilson. The lady on the other end of the line verified the fact that it was Mrs. Wilson speaking, and I asked her at that time if Miss Rosa, the girl who was there yesterday between 1:30 and 2:00 o'clock, could take some sedative to alleviate pain.* Q. Go right ahead. What did she say? A. And *she replied that that could be done without*

*any harm. I asked her about how long the girl would be in pain and she—and she told me that the time for such things as that was different in individual cases.* I asked her if the girl could eat and she said she could if she felt like it. *Q. What else was said, Mr. Matthews? A. So she asked me if the girl was flowing and I answered that she was and she asked me if she had removed the—as* I recall it—*packing and I replied no* because she had had instructions to leave it for twenty-four hours. . . . *Q. All right, what did Mrs. Wilson say in response to that? A. She verified the fact that it should stay there for twenty-four hours. Q. That's what she told you? A. Yes.''*

Prior to going to the home of appellant, the decedent had talked with Dr. Frank B. Reardan, of Sacramento, and had been advised by him that she was pregnant. On December 30th, about a week after the visit of decedent to appellant's residence, Dr. Reardan saw decedent, who was very ill with peritonitis, having a temperature of one hundred and a pulse rate of one hundred and three. The doctor ordered her at once to the Mercy Hospital at Sacramento. Dr. Reardan testified as follows:

''Q. Did you, between the time of December 30th and the time of her death on January 4th, yourself, in consultation with Dr. Henderson, come to any conclusion as to the cause of her illness? A. Yes, sir. Q. What was that, please? A. That she had been aborted and had an infection following abortion. Q. Now, Doctor, on the evening of January 4th shortly before she passed away, did you see her that evening? A. I did. Q. Do you recall about what time it was? A. About 6:00 o'clock in the evening. Q. And did you have any conversation with her at that time? A. I did. Q. Did you inform her of her condition? A. I did. *I told her that she was desperately ill and was not going to live; she was going to die.* I told her because of that fact I wished her to make a statement to the District Attorney's office or a member of the staff, and then I called Mr. O'Shea on the phone and asked him to come to the Mercy Hospital. Q. You did inform her that she was desperately ill and that she was going to die? A. Yes, sir. Q. And that you wanted her to make a statement as to her condition to somebody from the District Attorney's office? A. I did. Q. Did she give any indication that she wanted to do that? A. Gave no indication to the contrary. . . .

''Q. Now, will you tell us the exact words, as near as you

can remember, Doctor, just what you told Madeline Rosa at that time? A. I told her that—*I told her: 'Madeline, you are very ill and you are going to die. You are not going to get well and I* want you to make a statement to somebody in the District Attorney's office.' Q. Now, isn't it true, Doctor, that at that time you told her that she was gravely ill and that you didn't expect that she would live? A. No, I told her she was going to die. Q. Are you positive that that is what you told her, Doctor? A. That's what—what I told her, yes. Q. You are positive that you didn't tell Madeline Rosa that you didn't expect her to get well? A. Well, I didn't expect her to get well and I told her that. And I also told her she was·going to die. Q. Did she make any response to that statement, Doctor? A. No response. She looked at me. Q. She was conscious at the time, was she? A. Yes, sir. Q. *Do you know that she understood what you were saying? A. I do.* Q. She gave no indication at that time as to whether she believed your statement or not? A. I guess it shocked her. She didn't make any statement to the contrary to me. Q. You are positive, are you, Doctor, that Madeline Rosa gave no indication whatever that she expected that she was going to die? A. *I accepted it as an indication that she knew she was going to die because she didn't dispute me."*

Dr. A. M. Henderson, Jr., of Sacramento, a specialist in obstetrics, was called as a consultant in the case of decedent, and worked with Dr. Reardan. He testified that the deceased had been pregnant and had been aborted—an incomplete abortion, and subsequently developed a generalized peritonitis and died because of that. He also told the patient that she was going to die, his testimony on that point being as follows:

"Q. Did you advise her on the evening of January 4th as to her chances of recovery or not? A. I told the patient that she was going to die."

Father Thomas Morgan, chaplain of the Mercy Hospital and priest of the Catholic Church, testified:

"Q. Now, I will ask you to relate any conversation you had with her with reference to her physical condition, excluding, however, any confession she may have made to you in your capacity as a priest. A. *Well, the only thing I told her that she was in a very serious condition and in danger of death, and I thought it was the correct thing to prepare by receiving the last rites of the Church. Q. Did she consent to have the last rites administered? A. Yes, she did. Q. And did you do that? A. Yes, I did. . . . .* Q. What was her con-

dition at that particular time, Father? A. Well, how do you mean? Q. With reference to her physical and mental condition. A. Her mental condition was quite all right. Q. She was conscious at the time? A. Absolutely, yes.''

Dr. Henderson testified further:

''Q. What did you—withdraw that. What did she say as to the responsibility of any one for her then condition? A. Well, you asked her the question. Q. Do you recall what that question was? A. *You asked her if Mrs. Geraldine Wilson was responsible for her condition.* Mr. Brannely: Well, we will object to that as being leading and suggestive, your Honor. The Court: Overruled. Mr. O'Shea: Q. And what was her reply, if any, to that? A. *Her reply was 'Yes.'* Q. Was she conscious at that time, Doctor? A. Yes, she was conscious. Q. And do you know about how long after that it was that Madeline Rosa passed away? A. Well, I believe it was around 10:30.''

On January 9th, 1942, five days after decedent's death, Mrs. Edith Rosa, sister-in-law of decedent, went to appellant's home with her sister-in-law, Ann. Mrs. Rosa testified that the appellant stated at that time, after she had shown appellant a picture of decedent, that ''she might have been one of her cases, but she never took last names or remembered faces''. Appellant admitted at that time that she was ''working outside of the law.'' Mrs. Rosa testified, further, as follows:

''A. She also made me promise that I wouldn't come to the District Attorney's office. *She said that she would try to make things right for us.* Q. Said she would try to make things right with you? What did she say? Did she ask you to come back again? . . . Q. And did she ask you to come— A. *And for me to come by myself and not let anyone know I was coming out there.*''

Mrs. Rosa further testified that on the day following, she and her husband, John Rosa, went out to appellant's place, and that they were admitted by a Mrs. Cook, who also resided there; that she introduced her husband to Mrs. Wilson, and that Mrs. Wilson stated that she did not want to deal any more with Mrs. Rosa because she was hysterical, and asked Mrs. Rosa to go outside, which Mrs. Rosa did.

John Rosa testified that he then talked alone with appellant, and that appellant said she would give $50 or $75 to help out with the funeral of decedent. Rosa testified that he

left his hat at the residence of appellant, and on the following Monday he returned and received the hat from Mrs. Cook, and that when the hat was handed to him, it contained an envelope in which was enclosed $50 in currency, the envelope being opened in the presence of the officers of the law, and the currency being taken therefrom.

Dr. Michael J. Lipp testified that he was the Autopsy Surgeon, and that the deceased had died of an incomplete abortion or failure to completely empty the uterus. On cross examination he testified that he knew it was an abortion. We quote:

"And that led you to believe that this was an incomplete abortion. A. Didn't lead me to believe. *I actually knew it was.* Q. You felt that it was? A. Yes, because it was run up in the laboratory and that showed that it was placental tissue, too, which means that it was an incomplete pregnancy."

Dr. Lipp testified further that it was too long after the actual abortion for the instrument-marks to remain.

We will now quote the salient portions of the actual dying statement which was taken at the Mercy Hospital by the District Attorney in the presence of Dr. Henderson:

"Mr. O'Shea: Q. Can you tell me who it was? Do you know her name? Was it Genevieve Wilson? Dr. Henderson: I think Geraldine, the name is. Mr. O'Shea: Was it a woman by the name of Geraldine Wilson, Madeline? A. He was the one that performed. Q. He, or she? A. She. Q. Do you feel that you are in a position now you might not get well? Are you telling me that with the idea in mind you might not get well, Madeline? (No response). Are you telling me it was Geraldine Wilson, with the idea in mind you might not get well? I want to know that—I want to know that what you tell me is absolutely true—do you feel that way? (No response). Let me put it this way—*did you know her name?* A. Yes. Q. I am your friend, but I don't want to do any injustice of any kind to anybody—you know, as I know, if you thought you were going to die tomorrow, you wouldn't lie on anybody, would you, is that right? A. Yes. Q. You wouldn't, and I wouldn't, either—we have to find this out in the event you might or might not die. When you tell me it was Geraldine Wilson, do you tell it to me with the idea in mind that even if you died tomorrow, that would be the truth, would it? Would it, Madeline, when you say Geraldine Wilson, would you tell me that? A. Yes, I will. Q. So you feel, even if you died tomorrow, you would still say that was true,

is that true, Madeline? A. Yes, that is true. Q. Was there anybody else there with her when she did the operation on you, was there anybody else there? (No response). Dr. Henderson: Madeline, do you remember if there was anyone else there when Mrs. Wilson did this job, when she operated on you, was there any one else with her? (No response). Mr. O'Shea: Q. Did anybody help her do it, Madeline? (Witness shakes head negatively)."

Appellant took the witness stand in her own behalf. She admitted that Mrs. Edith Rosa and John Rosa had come to her place of residence at 1062-58th Street, and admitted that John Rosa had left his hat there. The remainder of her testimony was a categorical denial of the entire transaction. She did admit, however, that she had first told the District Attorney that she had never seen the Rosas before, and had finally stated that such statement was untrue.

■Appellant contends that the court erred in admitting the dying declaration of Madeline Rosa because, according to appellant's contention, it was not made under a sense of impending death.

In *People* v. *Pollock,* 31 Cal. App. (2d) 747, 749 [89 P. (2d) 128], this court said: "It is the province of the trial judge to determine the sufficiency of the foundation proof which will entitle dying statements to be admitted in evidence. Unless there is an apparent abuse of discretion in that regard, the ruling of the court will not be disturbed on appeal. (1 Wharton's Crim. Ev. 527, § 275b; *People* v. *Ybarra,* 17 Cal. 166.) . . . In determining the frame of mind of the declarant regarding his belief with respect to impending death, the court may consider his physical condition, the nature and seriousness of his wounds, his knowledge of his grave condition, his conduct, language and statements. (1 Wharton's Crim. Ev., 10th ed. 535, § 275c). It is not necessary that the injured person shall believe he will die immediately, provided he assumes he will not recover from his injuries and that death is impending. The duration of time which elapses between the declaration and the actual death of the person furnishes no criterion for the admission or the rejection of the evidence. (*People* v. *Ybarra, supra*). Numerous cases have sustained the admission of dying declarations under circumstances no more serious than those which appear in this cause. (*People* v. *Shortridge,* 179 Cal. 507 [177 Pac. 458]; *People* v. *Lee Sare Bo,* 72 Cal. 623 [14 Pac. 310]; *People* v. *Ybarra, supra.*) In the case of *People* v. *Gray,*

61 Cal. 164 [44 Am. Rep. 549], it is said that proof of a sense of impending death need not be proved by express statements to that effect, but may be determined from the . . . circumstances which are disclosed in the preliminary showing.''

Appellant's particular argument upon this point seems to be that the so-called dying declaration does not meet the legal requirements because Madeline Rosa did not state or admit that she believed she was going to die.

In Underhill on Criminal Evidence (4th Ed.), it is stated at pages 393, 394, 395:

''As in all other cases where a person's mental condition is relevant, this condition may, and from nature of things very often must be shown by circumstances and not proved by the express declarations of the deceased. The consciousness of approaching death may be inferred from the circumstances surrounding the dying man. He need not state expressly that he thinks or believes his end is near, or that he is at peace with his God, while making his statement, if the nature of his wounds, or his general physical condition, and his actions and language are such that the court is reasonably satisfied that he realized that he was about to die and had abandoned all hope of recovery. A physician may testify to declarant's physical condition.''

In *People* v. *Gray, supra*, the court said, at page 175: ''As to the proof of the existence of the sense of impending death, it may be gathered from any circumstance or from all the circumstances of the case. It need not be proved by the statement of the declarant that such belief exists. 'It is enough,' says Mr. Greenleaf on the subject of the admissibility of such declarations, 'if it satisfactorily appears in any mode, that they were made under that sanction; whether it be directly proved by the express language of the declarant or be inferred from his evident danger, or the opinions of the medical or other attendants stated to him, or from his conduct, or other circumstances of the case, all of which are resorted to, in order to ascertain the state of the declarant's mind.' (1 Greenl. Ev. § 158; *People* v. *Taylor, supra.*)''

Applying these well settled principles to the instant case, it is clear that the court did not err in admitting evidence as to the dying declarations of deceased. Before she made the statement, deceased had been told by three physicians that she could not recover; she had consented to the administering of the last rites of the Catholic Church; she was fully conscious and competent at the time the statement was made;

she died within a few hours after making the statement; and while she did not assert or proclaim that she was going to die, it is apparent from the statement itself and the surrounding circumstances that it was made under a sense of impending death. It cannot be held that the trial court abused its discretion in determining that the foundation proof was sufficient to entitle the dying declaration to be admitted in evidence. It is proper to add that the jury was instructed that if they were not convinced beyond a reasonable doubt that Madeline Rosa believed she would not recover, they must disregard such declaration.

Appellant next contends that the court erred in admitting in evidence the envelope and the $50 in currency, and the testimony of John Rosa with reference thereto. Appellant argues that since she was not personally present at the house when Mrs. Cook handed John Rosa his hat containing the envelope and the $50 in currency, it could not be used as evidence against her. There is no merit in this contention. As already pointed out, John Rosa testified that in his conversation with appellant at her house two days before, as hereinbefore pointed out, appellant had stated that she would give $50 or $75 to help with the funeral expenses of decedent, and that he had left his hat there, and that when he returned Monday, Mrs. Cook handed him his hat, containing the envelope and currency. The evidence in question was of course circumstantial, but it was certainly admissible, its weight being a matter for the jury to consider.

Appellant's third contention is that the court erred in refusing to instruct the jury that Madeline Rosa and James Matthews were accomplices. Appellant offered an instruction which told the jury flatly that James Matthews was an accomplice, and also offered the following instruction:

"The court instructs the jury that Madeline Rosa, the decedent, was an accomplice to the commission of the crime, if any crime was committed in this case—the court neither assuming or intimating that any crime has been so committed; that any supposed dying statement given by her must be corroborated by other testimony before it can be accepted or considered by you in establishing the guilt of this defendant, if any; it is not enough that her testimony be corroborated by that of the witness *James Matthews* whom the court has previously advised was likewise an accomplice; the mere fact that one accomplice may corroborate or tend to corroborate another does not make, or tend to make the testimony of both

accomplices, or any part thereof, of sufficient weight to be considered as evidence. The testimony of all accomplices must be corroborated by evidence other than their testimony, and that corroborating evidence must relate to the very matters and things about which such accomplices gave testimony; in the absence of any such corroboration you are hereby instructed to disregard all the testimony of all the accomplices, including the supposed dying declaration of the decedent.''

In refusing the instruction just quoted, the trial court endorsed thereon the following:

''Whether Matthews is an accomplice is a question of fact; merely driving the deceased to the scene of the crime would not constitute him an accomplice. The dying declaration disputes this, which would leave only his uncontradicted testimony that he phoned the defendant, made no appointment with her, talked with the deceased, and counseled her against the abortion.''

The court gave the following instructions dealing with the question of accomplices:

''Upon a trial for procuring or attempting to procure an abortion, or aiding or assisting therein, the defendant cannot be convicted upon the testimony of the woman upon whom, or with whom the offense was committed unless she is corroborated by other evidence.''

      \*    \*    \*

''A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged upon the defendant on trial in the cause in which the testimony of the accomplice is given.''

      \*    \*    \*

''In determining whether the testimony of an accomplice has or has not been corroborated, you cannot consider the testimony of another accomplice because the testimony of one accomplice cannot corroborate the testimony of another accomplice under the provisions of Section 1111 of the Penal Code just read to you.''

      \*    \*    \*

''You are instructed that a conviction cannot be had upon the testimony of an accomplice unless it be corroborated by

such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

"You are further instructed that the evidence necessary to corroborate the testimony of an accomplice must of itself and without the aid of the testimony of the accomplice, tend to connect the defendant with the commission of the offense charged. It must do so of its own force independently of the testimony of the accomplices. If, after the evidence of the accomplices is eliminated from the case, the evidence of the other witnesses has no essential connection with any crime and is as consistent with innocence as with guilt, or if it raises only a suspicion of guilt, the testimony of the accomplice is not corroborated within the meaning of the Code."

\* \* \*

"While it is true that a conviction cannot be had on the testimony of an accomplice, unless he is corroborated by other evidence tending to connect the defendant with the commission of the offense, yet I charge you that such corroborative evidence need not tend to establish the precise facts testified to by the accomplice. It is sufficient if such corroborative evidence, standing alone, tends to connect the defendant with the commission of the crime charged."

\* \* \*

"In order to render a person an accomplice, he or she must in some manner knowingly and with criminal intent, aid, abet, assist or participate in the criminal act, and whether or not one is an accomplice as defined in these instructions, is for the jury to determine from all the testimony and circumstances in proof in the case."

\* \* \*

"For one person to abet another person in the commission of a criminal offense, simply means, to knowingly and with criminal intent, aid, promote, encourage or instigate, by act or counsel, or by both act and counsel the commission of such criminal offense."

\* \* \*

It thus appears that the jury was thoroughly instructed as to the law relating to accomplices, and the necessity and extent of corroboration required to sustain a conviction. We do not believe that the trial court was required to go further. Whether or not James Matthews was an accomplice was a

question for the jury to determine from the evidence, and under the instructions of the court. (*People* v. *Negra,* 208 Cal. 64, 69 [280 Pac. 354]; *People* v. *Compton,* 123 Cal. 403, 407 [56 Pac. 44].) The court would not have been justified, upon the record here, in instructing the jury, as a matter of law, that Matthews was an accomplice. An accomplice is defined by section 1111 of the Penal Code as "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of an accomplice is given." There is no evidence in the record showing that Matthews had anything to do with the actual abortion. Even though he did talk with appellant on the telephone, and took decedent over to appellant's house, and then later asked appellant what to do regarding treatment, he certainly did not assist in the abortion itself, since he sat outside the house during the time Madeline Rosa was within, and there is no evidence he ever went into the Wilson house. Furthermore, he testified that he counseled Madeline against the abortion.

The trial court read sections 1108 and 1111 of the Penal Code to the jury. We do not believe the court was required to go further and instruct the jury in so many words that Madeline Rosa was an accomplice in her own murder. Whether or not Madeline Rosa was an accomplice is a question which has not been definitely determined by our Supreme Court. In *People* v. *Gibson,* 33 Cal. App. 459 [166 Pac. 585], a case in which defendant was also convicted of murder in the second degree, the death of deceased resulting from an attempted abortion, the court said, at page 461:

"Defendant also insists that the dying declaration of the deceased was not corroborated, and that therefore the judgment should be reversed. This position is based upon the provisions of Section 1108 and Section 1111 of the Penal Code. The former section provides that upon a prosecution for procuring an abortion the defendant cannot be convicted upon the testimony of the woman upon whom the offense was committed unless she is corroborated by other evidence. Section 1111 provides that a conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense. As to the first of these sections, it would seem to be a sufficient answer to the defendant's contention to say that this is not a prosecution for procuring an abortion—the defendant is charged with murder. As to sec-

tion 1111, perhaps, suffice it to say that it is inapplicable to this case for the reason that the deceased could not well be regarded as an accomplice in her own death, but should rather be considered a victim of the offense."

In denying a hearing, the Supreme Court said, at page 463:

"Our order denying a hearing in this court is not to be taken as an intimation of our approval of that portion of the opinion which intimates that the deceased could not be regarded as an accomplice whose testimony required corroboration under the provisions of section 1111 of the Penal Code. Nor is our denial to be taken as intimating an opinion one way or the other on the question of the application of section 1108 of the Penal Code."

We have been unable to discover any decision dealing with this precise question, but in view of the fact that section 1111 defines an accomplice as "one who is liable for prosecution for the identical offense charged against the defendant on trial," it would seem to us that in this case, where appellant was charged with the murder of Madeline Rosa, it would not be reasonable to hold as a matter of law that Madeline Rosa was an accomplice in her own murder.

We therefore conclude that the trial court did not err in refusing to give the instructions offered by appellant.

Appellant's fourth contention is that the evidence is insufficient to sustain the verdict of the jury. Appellant asserts that "1. There is an utter lack of any evidence whatever, as to how, or by what means, if any, the alleged abortion was performed upon Madeline Rosa"; and "2. The evidence is wholly insufficient to connect defendant with the abortion which caused the death of Madeline Rosa". Section 274 of the Penal Code reads as follows:

"Every person who provides, supplies, or administers to any woman, or procures any woman to take any medicine, drug, or substance, or uses or employs any instrument or other means whatever, with intent thereby to procure the miscarriage of such woman, unless the same is necessary to preserve her life, is punishable by imprisonment in the state prison not less than two nor more than five years."

Appellant argues that this statute means that it must be shown that the accused either administered a drug, or used an instrument, and that since none of the doctors who testified made the direct statement that some drug or instrument had been used, there was a failure of proof in this respect. How-

ever, the record shows that three doctors testified that the decedent died by reason of an *incomplete abortion*. We think it may fairly be stated that the term "abortion" usually implies criminality in producing a miscarriage, the latter term denoting any premature birth, irrespective of cause. Dr. Reardan testified that in consultation with Dr. Henderson he had reached the conclusion that Madeline Rosa had been aborted, and had an infection following abortion. There is also the testimony of Matthews that on the day following the day he had driven Madeline Rosa to appellant's house, he had a conversation with appellant on the telephone, and appellant had asked him if decedent was flowing, and if the packing had been removed from the uterus. This is sufficient evidence to justify the jury in inferring that some foreign substance was injected into the interior cavity of the decedent by appellant, and certainly is within the term "other means whatever", employed in said section 274, *supra*.

Appellant lays great stress upon the point that none of the doctors testified to the presence of any instrument marks on the uterus of decedent, but the testimony of Dr. Lipp, who performed the autopsy, was to the effect that no instrument marks would be in evidence after the length of time from the date of the abortion to the day of the autopsy. It must be borne in mind that, as hereinbefore stated, appellant was charged with the crime of murder, not with the crime of abortion, and the degree of proof required was not the same as in a number of the cases cited by appellant, where the defendant was charged with committing an abortion by means of certain instruments, or by certain means, specifically indicating them. We conclude that the evidence is sufficient to show that an illegal abortion was committed upon decedent, and that her death resulted therefrom.

As to the contention of appellant that the evidence is insufficient to connect her with the abortion which caused the death of decedent, we do not think it is sustained by the record. There is the evidence of Matthews that he talked with appellant over the telephone; that he took the decedent to 1062-58th Street in Sacramento, which was the house of appellant. There are the further conversations of the Rosas with appellant, in which appellant stated that "this might have been one of her cases", and that "she worked outside of the law", which are clearly damaging admissions by appellant. There is also the testimony of John Rosa that appellant stated to him that she would give $50 or $75 to help with

funeral expenses, and that when he returned to the house on Monday, two days following, he was handed his hat by Mrs. Cook, who lived at the house, and the hat contained an envelope in which was enclosed $50 in currency.

As hereinbefore stated, the question as to whether Matthews was an accomplice was one for the jury to decide, and it must be held, in support of the verdict, that the jury did not consider Matthews to be an accomplice. And even if it should be considered that the decedent was an accomplice, which, however, we do not hold, there was sufficient evidence to prove the offense and to connect appellant therewith, independent of the dying declaration of decedent, and certainly the dying declaration of decedent was amply "corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense". As was said by our Supreme Court in *People* v. *Newland,* 15 Cal. (2d) 678 [104 P. (2d) 778], page 681:

"The rule applicable, where there is evidence, circumstantial or otherwise, that a crime has been committed and that the defendant was the perpetrator thereof, has been many times reiterated by the reviewing courts of this state as follows: The court on appeal 'will not attempt to determine the weight of the evidence, but will decide only whether upon the face of the evidence it can be held that sufficient facts could not have been found by the jury to warrant the inference of guilt. For it is the function of the jury in the first instance, and of the trial court after verdict, to determine what facts are established by the evidence, and before the verdict of the jury, which has been approved by the trial court, can be set aside on appeal upon the ground of "insufficiency of the evidence," it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below. The determination of a charge in a criminal case involves proof of two distinct propositions: First, that the offense charged was committed, and second, that it was perpetrated by the person or persons accused thereof. . ., . We must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence, and then determine whether such facts are sufficient to support the verdict.' If the circumstances reasonably justify the verdict of the jury, the opinion of the reviewing court that those circumstances might also reasonably be reconciled with the innocence

of the defendant will not warrant interference with the determination of the jury. (*People* v. *Perkins,* 8 Cal. (2d) 502 [66 P. (2d) 631]; *People* v. *Tom Woo,* 181 Cal. 315 [184 Pac. 389]; also, *People* v. *Green,* 13 Cal. (2d) 37 [87 P. (2d) 821]; *People* v. *Latona,* 2 Cal. (2d) 714 [43 P. (2d) 260]; *People* v. *Tedesco,* 1 Cal. (2d) 211 [34 P. (2d) 467]; *People* v. *Bresh,* 33 Cal. App. (2d) 161 [91 P. (2d) 193]; *People* v. *Wilson,* 33 Cal. App. (2d) 194 [91 P. (2d) 207].)''

Appellant's final contention is that the court erred in denying the motion for a new trial. In support of the motion for a new trial, appellant filed affidavits by herself, one of her counsel, and two other persons. The affidavits of appellant and her counsel were to the effect that they were not aware until the testimony was produced at the trial, that the prosecution would attempt to fix December 22, 1941, as the date upon which the alleged abortion was committed; and that during the trial appellant was unable to recall, and is now unable to recall, where she was, or what she did on the afternoon of December 22nd; and that it was not until after the trial that they became aware of the facts set forth in the affidavits of Charles T. Carter and Dr. W. H. Jordan. The affidavits of Carter and Dr. Jordan recited that on the afternoon of December 22nd, 1941, they both called at the residence of appellant and remained there from about 1 o'clock p. m. until sundown, and that during that entire time appellant was in their presence, and that no person or persons called at said premises, and that appellant performed no abortion upon any person during said time. In *People* v. *Weber,* 149 Cal. 325 [86 Pac. 671], the court said, at page 350:

''It is to be remembered that a wise discretion is vested in the trial court in determining the weight to be given to the statements contained in affidavits upon motion for new trial. This discretion is to be exercised in determining the diligence shown, the truth of the matters stated, and the materiality and probability of the effect of them, if believed to be true. Moreover, it is to be remembered that a trial court is justified in regarding with distrust affidavits of newly discovered evidence on motions for new trial.'' (Citing cases) ''Potent as this affidavit might have been, if believed, it may not be said that the trial court did not exercise a sound discretion in discrediting it, and so in denying the motion in support of which it was brought forward.''

The following language of our Supreme Court in *People* v.

*Yeager,* 194 Cal. 452, 491 [229 Pac. 40], is quite applicable to the instant case:

"There is no showing that appellant could not, with reasonable diligence, have discovered and produced the supplemental evidence at the trial (subd. 7, § 1181, Pen. Code) and have it determined on its merits. 'The claim of newly discovered evidence warranting a new trial is universally looked upon by the courts with distrust and disfavor. Public policy demands that a litigant should be compelled to exhaust every reasonable effort to produce at his trial all existing evidence in his behalf. It has been said that the circumstance that the testimony has just been discovered when it is too late to introduce it is so suspicious that courts require the very strictest showing of diligence.' (8 Cal. Jur. p. 427.)"

We are convinced that the trial court did not abuse the wise discretion vested in it in denying appellant's motion for a new trial.

In view of the foregoing, the judgment of conviction and the order denying the motion for a new trial are, and each of them is, affirmed.

Adams, P. J., and Thompson, J., concurred.