[Crim. No. 661. Fourth Dist. Oct. 8, 1948.]

THE PEOPLE, Respondent, v. CHARLES J. GONZALES, Appellant.

Robert D. Allen for Appellant.

Fred N. Howser, Attorney General, and Henry A. Dietz, Deputy Attorney General, for Respondent.

GRIFFIN, J.—Defendant was charged with the offense of murdering one Paul Matthews. A jury trial resulted in a verdict of guilty of murder in the first degree with recommendation of life imprisonment.

On September 21, 1947, defendant, while in the United States Army Air Force, was acting as a lifeguard at March Field. In his duties he wore a bathing suit and he had several of them set aside for this purpose. One was "yellow-colored" which he wore most of the time. Defendant there met Matthews, who was a civilian employee in Riverside. With him were Ralph Fisher and Floyd Hill, who were servicemen. They ate dinner at the mess hall. Matthews was using a pass belonging to some serviceman. After "chow" the boys went to their barracks to dress in civilian clothes. Defendant wore a yellow sweater and a pair of slacks. They all went to the city and arrived at the Q. P. Ice Cream Store.

There, at about 6:30 p. m., before dark, defendant and Matthews were talking for about five minutes. According to Hill's testimony, something was said by one of them (he believed it was Gonzales) about "going into the alley" and "settle their differences" and something about "a fair fight"; that these four men walked out around the corner and into the alley; that at first Matthews and Fisher were in front and later defendant and Matthews were in front and Fisher and Hill were in the rear; that Hill leaned against the building in the alley, about 6 feet away from Gonzales and Matthews, who assumed a fist-fighting position; that a couple of blows were struck and Matthews said something about "not pulling a knife"; that defendant "reached for something . . . toward his stomach . . . about belt high" and he saw a black object which looked like a gun and the next thing he knew he heard a shot and he started to run; that he ran up the alley and as he was doing so he looked around and saw Gonzales coming; that defendant joined him and they started walking up toward 7th Street; that he then noticed a couple of girls; that they continued on around 7th Street to Main Street and thence to the Q. P. Ice Cream Store; that as they approached it they saw Matthews lying in front of the store and also saw Fisher there; that defendant told Hill not to say anything about this to anyone; that Fisher called an ambulance and they started walking up to Matthews and tried to help him up; that Matthews told them to leave him alone because the pain was too great (he had been shot in the abdomen); that the police and ambulance came and took Matthews to the hospital and the next night he died of a gunshot wound; that Fisher, Hill and Gonzales went into the Q. P. Ice Cream Store for a few minutes and then went skating. Hill said that he sent flowers and also attended the funeral with Gonzales; that after Matthews' death defendant told him to tell the officers that two strangers were molesting a couple of girls and that Matthews went to help the girls and he (Hill) "invited the two strangers into the alley." He then testified that he and Gonzales visited the Q. P. Ice Cream Store the next day and the police took them to the police station for questioning; that several days later Fisher and Gonzales were holding a conversation in the Q. P. Ice Cream Store and that he heard a girl's name "Rosalie" mentioned and either Fisher or Gonzales was "pounding on the table—once"; that he later met "Rosalie." On cross-examination this witness

admitted making a statement to the officers that while defendant Gonzales, Fisher and Matthews were standing in front of the Q. P. Ice Cream Store two girls came up, followed by two strangers, and that an argument developed between the two strangers who were molesting the girls and that Fisher and Matthews agreed to go around in the alley and fight; that he saw them turn the corner and described their general appearance. He then said that Gonzales told him to tell that story and that he was afraid of him.

Other witnesses said they saw Matthews coming out of the alley staggering as though he were drunk; that he was pulling off his heavy black gloves and holding his stomach with his hands; that he threw the gloves in the doorway near the Q. P. Ice Cream Store and fell to the ground; that they saw someone take a card from deceased's pocket, the "chow pass"; that they saw someone with a "T" shirt on, appearing very nervous, and picking up the body and trying to carry it away but he was told to leave it there because an ambulance had been called; that another boy standing around there was wearing a sweater "not white," but an "off-colored sweater." A yellow sweater purportedly worn by defendant was received in evidence. One witness identified the defendant as the one he "believed" was wearing the sweater and that Fisher was wearing a "T" shirt; and that these men were present and in hearing distance (less than 1 yard) that night in front of the Q. P. Ice Cream Store where Matthews was lying on the sidewalk; that there were two girls who seemed to be with them; that about 20 other people were gathered around; that the witness asked Matthews who shot him and Matthews replied, while looking at the defendant "The guy in the yellow sweater"; that the witness looked up directly at the defendant and they looked directly at one another and the defendant said nothing in response to the statement. On cross-examination the witness said that he first asked Matthews his name and what had happened; that Matthews said: "I cracked off at a couple of girls . . .; these guys wanted to be heroes"; "the guy in the yellow sweater shot me."

A Miss Henderson testified that on the night of the shooting she and another girl were walking on 8th Street near the Q. P. Ice Cream Store and she saw Matthews and Fisher (who winked at them) and a "dark haired or complected boy" and another boy following, whom she did not recognize, going down 8th Street toward the alley; that the girls

stood in front of the Q. P. Ice Cream Store for a few minutes and later heard someone groaning behind them; that they turned and saw Matthews fall down on the sidewalk; that people gathered around and "after a while" Fisher, "all of a sudden," appeared "out of the grey" and Matthews told him to take the "chow pass" out of his pocket. She then stated that she had seen defendant in the Q. P. Ice Cream Store several times and on that occasion he had a yellow bathing suit in his hand. She identified the yellow bathing suit in evidence purportedly worn by defendant at the field. She then testified she had met defendant and Hill on several occasions prior to September 21st.

Her girl friend testified to about the same facts but stated that as to the boys marching up the street to the alley, the one in the back "was a different nationality"; that he "had dark hair."

Several girls were near the alley on 7th Street. They testified that they saw two men scuffling in the alley and heard a shot fired; that they saw one man bending over and running down toward the alley on 8th Street and two other men running out of the alley leading toward Market Street.

Rosalie Ruiz, aged 17, testified she had met Matthews about one week prior to the shooting; that she met him through Fisher and saw him every day thereafter; that they skated together and on the night of September 17th, she went to the bus station with one Cramer; that it was too late to catch the last bus and Cramer saw Fisher and defendant Gonzales with three other boys go by in a car; that he called Fisher and asked him to take Rosalie home; that instead of taking her home they took her out into the hills in some cemetery. (Rosalie was in the rear seat with Fisher and Gonzales.) A question was propounded to her by the district attorney as to what happened there. Objection was made. Out of the presence of the jury counsel discussed the admissibility of the proffered evidence. It should be here noted that the district attorney in his opening statement to the jury mentioned that he expected to prove "as a motive" for the killing that Matthews was acquainted with Rosalie Ruiz; that after these boys took her to the cemetery "at least four of these boys raped Rosalie"; that later Rosalie told Matthews about it and "that there is a motive for the killing." Counsel for defendant assigned the statement as prejudical misconduct, and claimed that such evidence did not in fact disclose any motive and that evidence of another offense was not admis-

sible. The trial court stated to the jury: "It will be the duty of the Jury—to determine whether or not a motive is shown—the only charge with which we are concerned—is the charge of Murder, and with no other charge, whatsoever. The jury will be instructed that the statements of counsel—do not constitute evidence—that it was unable to pass upon the question of admissibility of another offense until such evidence was offered." In the absence of the jury, the district attorney offered to prove that defendant Fisher and two others forcibly raped Rosalie; that some of them were holding her while others performed the acts; that she was threatened by one Hagler that if she told the police "she would be taken care of"; that they then took her back to town and the next day she told Matthews, her boy friend, about these boys and he suggested that she go to the police with the matter then; that she refused because she was scared and didn't want the publicity; that soon thereafter Matthews met Fisher and he invited him to the field to stay all night and the next morning he met Gonzales; that they went swimming together and later came into town, at which time the argument above mentioned ensued. The district attorney argued that he offered this evidence to show motive and intent; that "bad blood" arose between Gonzales and Matthews and that Gonzales felt that Matthews knew too much and might go to the police and therefore wanted "to get him out of the way." Objection to the offer was sustained. However, Rosalie was then permitted to state, in the presence of the jury, that she told Matthews what had happened to her the night before in the cemetery.

Police officers testified that they searched the alley but no gun was found. Fisher, who had on a "T" shirt, was taken into custody for questioning. He later went into the alley and came back wearing a flowered sport shirt.

Several doctors testified as to the serious condition of Matthews at the time he arrived at the hospital and as to his subsequent mental and physical condition after the operation, for the purpose of laying a foundation for the introduction of a dying declaration made by decedent. This testimony was taken by the court in the absence of the jury. On Matthews' admission to the hospital he was in a condition of severe shock, perspiring profusely and had a weak pulse. He had an indented wound in the left abdomen and in the left posterior abdomen wound there was tissue extruding from it. In the operating room an excision was made under spinal anesthesia.

His condition was so serious that it was deemed advisable to close the abdomen and to obtain blood and plasma to build him up for any further surgery that might be indicated. Matthews was noncooperative and continued fighting the doctors who informed him that "if he did not cooperate they did not have much chance of saving his life." He made no response but continued his course of conduct. The next morning Matthews asked for his parents. He was more or less irrational but was "still struggling—fighting and wrestling around." The doctor testified that in between times one could rouse him by speaking to him; that in reply to a question by the doctor, i. e., "Bill—who shot you?" Matthews replied: "The guy in the yellow bathing suit." The trial court asked the doctor if in his opinion Matthews was in such condition that he knew about the subject on which he was speaking and was capable of passing an intelligent thought on that subject. The doctor replied that that was an awful hard question to answer; that he did not know. A few hours later a police officer shook Matthews and asked the same question and got the same answer.

In disposing of the question presented the trial court remarked that the purpose of the preliminary examination—when the foundation is sought to be laid for a dying declaration, is to let the court ascertain whether there is anything of a substantial nature to be submitted to the jury and if the court finds that there is, the evidence is admitted, and the jury is supposed to weigh it just as they do other evidence, with the understanding that the belief of impending death existed, i. e., with the instruction to the jury that it shall determine from the evidence whether or not the statements were made under sense of impending death and if so the jury may consider them; otherwise, it shall disregard them. Defendant failed to bring up the instructions given or refused as a part of the record on appeal.

Thereafter the jury were recalled and the evidence above set forth was, over objections, restated to the jury and the People rested.

Counsel for defendant then introduced evidence to show, as indicated by his opening statement to the jury, that Fisher and Matthews had been buddies; that they went to March Field on the night of the 20th and stayed there; that they met Gonzales, whom Matthews had known for a week or two; that they played pool, went swimming and laughed and joked

during that afternoon and evening; that they all came to the Q. P. Ice Cream Store, and while in front of it they saw two girls coming toward them followed by two strange men who were molesting the girls; that when they arrived in front of the Q. P. Ice Cream Store Fisher and Matthews challenged the two strangers to go around in the alley and fight; that Matthews and Fisher led the way and that Gonzales and Hill remained in front of the Q. P. Ice Cream Store; that shortly thereafter Fisher came around the corner and told them Matthews had been shot; that·Matthews then came around the corner and fell on the sidewalk, as heretofore indicated; that Hill and Gonzales were not in the alley at any time and that Matthews met his death at the hands of one of the two strangers. He produced some witnesses supporting his statement. Some of these witnesses were impeached by contradictory statements made by them at the coroner's inquest and to the police officers shortly after the shooting. One endeavored to account for the change in her testimony as being the result of coercion on the part of the police, and said it was because ''I was out of my head.''

Another witness who accounted for defendant's presence in front of the Q. P. Ice Cream Store all during the shooting episode had previously told the police, according to their reporter, that he saw Matthews, Gonzales, Fisher and Hill arguing in front of the Q. P. Ice Cream Store the evening of the shooting; that Fisher said: ''Let's all four of us go into the alley—settle this if you want to fight''; that Fisher and Matthews were in the lead and were followed by Gonzales and Hill; and that Matthews was putting on his gloves. A statement of these related facts was signed by the witness and offered in evidence by way of impeachment.

A police officer testified that while in the emergency hospital, shortly after the shooting, he heard Matthews say ''he didn't know'' who shot him; that he asked him how it happened and he said he met two boys and two girls previously that day and that he tried to ''pick up'' one of the girls; that later he met the two men in the alley on 8th Street and one of these boys pulled the gun and shot him; that he described the two boys and said the one ''with a yellow tie'' shot him.

Defendant Gonzales, aged 19, of Spanish, Portuguese and French descent, admitted that he wore the yellow bathing suit in evidence prior to and subsequent to the day of the shooting but claimed he did not wear it on that day. He then testified about his activities and those of the two claimed strangers.

They were about in accordance with his counsel's opening statement to the jury. He was confronted with previous statements made by him to several police officers. These statements were in considerable conflict with his testimony given at the trial.

Fisher, defendant's main witness, described the meeting in front of the Q. P. Ice Cream Store and told about the two strangers. He said he went with Matthews and the two strangers into the alley; that he was taking off his sport shirt and that Matthews was putting on a pair of gloves; that one of the strangers pulled a gun and shot Matthews; that he (Fisher) ran out the alley to 8th Street and back in front of the Q. P. Ice Cream Store; that he there found defendant Gonzales and Hill; that neither one was in the alley at any time and that soon after he arrived in front of the store Matthews came around and fell in front of it, as heretofore described. He had previously told the police that Gonzales had on a "light yellow" bathing suit on September 21st, when they were all swimming at the pool. The witness, at the conclusion of his testimony, by way of impeachment, admitted he had been previously convicted of attempted robbery. Defendant then produced several witnesses which tended to impeach the testimony of Hill.

In rebuttal, police officers were recalled and testified that defendant first told them that he did not see Matthews and Hill at the pool that day; that he first saw them in front of the Q. P. Ice Cream Store; that he was sure they were not with him when he came to town; that after questioning Fisher they returned to Gonzales and confronted him with Fisher's statement and Gonzales then said he "lied" about that part of it because he didn't want to "get mixed up in any mess." One rebuttal witness testified that Fisher said, in regard to the shooting of Matthews, that "two men in a car went by and shot him" and that he, Fisher, "jumped around the corner when they shot at me." Another witness identified the sweater of the defendant as the one the "dark complected" person was wearing the night the four men were proceeding into the alley and the "T" shirt in evidence "resembled" the one the witness saw on Fisher that same time. Another witness, who was working at the Q. P. Ice Cream Store, testified that defendant and Fisher were not in the vicinity of the Q. P. Store when the shooting took place; that after the police were called by her she went out in front, saw Matthews lying on the sidewalk and she looked up and saw defendant and

Hill coming down 7th Street together; "they were at a pace . . . just slowing down to a walk"; that she did not see Fisher there at all.

A police detective testified that while defendant was in jail, defendant asked him what the penalty was for first degree murder; that he explained it and defendant said: "How about second degree murder"; that he explained that and defendant asked: "What is the deal on manslaughter" and he explained it; that defendant then said: "Well, I would probably be better off to go in and plead guilty, because it looks like they are going to pin this on me, even though I am not guilty . . . I will tell you what . . . you let me think this over and I will tell you in the morning what I intend to do." After being instructed as to the law the jury returned the verdict as recorded.

██ The first argument of defendant is that the evidence produced by the prosecution is so inherently improbable as to be incredible and unworthy of belief. He practically concedes that Hill's testimony shows that defendant shot Matthews, but claims his testimony is entirely discredited and therefore there is no evidence pointing towards defendant's guilt. The evidence conclusively shows that Matthews' death was the result of a gunshot wound. Although conflicting, there is sufficient substantial evidence connecting the defendant with the shooting. The weight to be given this evidence was for the jury to determine. (Pen. Code, § 1126.) Its conclusion, therefore, in this respect, may not be disturbed on appeal. (*People* v. *Latona,* 2 Cal.2d 714, 725 [43 P.2d 260] ; *People* v. *Perkins,* 8 Cal.2d 502, 511 [66 P.2d 631].)

The second point is that the district attorney was guilty of prejudicial misconduct in his statement to the jury as to what he expected to prove as a motive for the commission of the murder. ██ The presence or absence of motive is a circumstance going to the question of the guilt or innocence of the accused, and proof thereof is always admissible and often valuable and is sometimes of assistance in removing doubt and completing proof which might otherwise be unsatisfactory, and sometimes is relevant in solving a doubt as to the degree of the offense and may be material where the evidence as to the identity of the criminal is circumstantial.

██ Considerable latitude is allowed in the reception of evidence on the question of motive. It is settled that evidence having a direct tendency, in view of the surrounding circumstances, to prove motive on the part of a person to commit

the homicide, and thus to solve a doubt either as to the identity of the slayer, the degree of the offense, the insanity of the accused, or the justification or excusability of his act, is admissible, however discreditably it may reflect upon the defendant, and even where it may show him guilty of other crimes. See 13 Cal.Jur. § 74, p. 685, and cases cited, including *People* v. *Greig,* 14 Cal.2d 548, 561 [95 P.2d 936] ; *People* v. *Larrios,* 220 Cal. 236, 251 [30 P.2d 404] ; *People* v. *Aranda,* 12 Cal.2d 307 [83 P.2d 928] ; *People* v. *Hall,* 27 Cal.App.2d 440 [81 P.2d 248] ; *People* v. *Perkins,* 8 Cal.2d 502 [66 P.2d 631] ; *People* v. *Planagan,* 65 Cal.App.2d 371, 403 [150 P.2d 927] ; and *People* v. *Cook,* 148 Cal. 334 [83 P. 43], where it was held that proof of incestuous relationship between the defendant and his daughter was admissible on a prosecution for the murder of a rival, when it furnished ground for a logical inference of a desire to put the rival out of the way. (See, also, 8 Cal.Jur. § 172, p. 68.) ▮ The proffered evidence as to motive was admissible and, if established, was a circumstance that might well have been considered by the jury. (*People* v. *Gosden,* 6 Cal.2d 14, 25 [56 P.2d 211] ; *People* v. *Argentos,* 156 Cal. 720 [106 P. 65] ; *People* v. *Miller,* 121 Cal. 343 [53 P. 816] ; *People* v. *Peete,* 28 Cal.2d 306, 315 [169 P.2d 924].) Therefore there was no prejudical misconduct on the part of the district attorney when he stated to the jury that he expected to prove these facts in establishing motive for the commission of the crime. ▮ Defendant cannot claim prejudice by reason of an erroneous ruling of the court which is in his favor.

The third contention of appellant is that the court erred in admitting into evidence the claimed dying declarations of decedent made to a police officer and a doctor as to the identity of the person who shot him, i. e., "A fellow in a yellow bathing suit."

▮ To be admissible in evidence as dying declarations, the statements of the decedent must have been made at a time when he had abandoned all hope of life so that he believed that death inevitably must follow. ▮ This sense of impending death may be shown in any satisfactory mode, by the express language of the declarant, or be inspired from his evident danger, or the opinions of medical or other attendants stated to him, or from his conduct, or other circumstances in the case, all of which are resorted to in order to ascertain the state of the declarant's mind. (*People* v. *Hoffman,* 195 Cal.

295, 307 [232 P. 974].) ▆ In determining the admissibility of the statements, the court had the right to consider decedent's physical condition, the nature of his wounds, his knowledge of his serious condition, his conduct, and his statements. (*People* v. *Hashaway*, 67 Cal.App.2d 554, 569 [155 P.2d 101].)

In *People* v. *Pollock*, 31 Cal.App.2d 747, 754 [89 P.2d 128] the court said:

"It is the province of the trial judge to determine the sufficiency of the foundation proof which will entitle dying statements to be admitted in evidence. Unless there is an apparent abuse of discretion in that regard, the ruling of the court will not be disturbed on appeal. (1 Wharton's Crim. Ev. 527, sec. 275b; *People* v. *Ybarra*, 17 Cal. 166.)" This language was approved in *People* v. *Wilson*, 54 Cal.App.2d 434, 441 [129 P.2d 149].

The court in *People* v. *Singh*, 182 Cal. 457 [188 P. 987], in discussing the relative functions of the court and the jury touching the admission and determination of dying declarations, held that the court alone should pass on the admissibility of this character of evidence, and that the jury should exclusively determine its probative value. It was there said, page 476:

"Whatever the law may be in other jurisdictions, it is well settled in this state that it is the function of the trial court primarily to pass upon the admissibility of the alleged dying declarations and of the jury to determine whether they were in fact made under a sense of impending death, and, if so, then to determine the credibility and weight to which they are entitled."

At the time of the declarations, decedent was in extreme pain from an abdominal gunshot wound of such a serious nature that surgery was discontinued. He was noncooperative and continued fighting the doctors after they had informed him that "if he did not cooperate they did not have much chance of saving his life." Within a short time decedent asked for his parents. He was more or less irrational and at times could be roused by questions. There was testimony to the effect that the deceased, while lying on the sidewalk and in the presence of the defendant, made the statement in response to the question as to who shot him that it was "the guy in the yellow sweater." There was ample evidence, other than the declarations, to identify the defendant as the person who fired the shot.

880

■ The trial court indicated that it would properly instruct the jury on the subject of reception of claimed dying declarations and that the jury was to weigh the evidence concerning declarations of the deceased as any other evidence and determine whether or not the statements, if made, were made under a sense of impending death, and if so, to consider them, otherwise such statements were to be disregarded. Since defendant, on appeal, failed to bring up the instructions, both given and refused, we cannot, under these circumstances, presume that the trial court failed or refused to instruct the jury as indicated. We cannot say that there was an abuse of discretion in admitting the declarations in evidence for the consideration of the jury or that prejudicial error resulted.

■ Appellant next contends that the court erred in admitting into evidence a yellow bathing suit claimed to have been worn by the defendant, and in refusing to strike the testimony of Rosalie Ruiz. The weight to be given to such evidence was a question for the jury to determine. We see no error in the rulings of the court.

Finally, it is contended that the evidence is insufficient to show that the appellant was guilty of murder in the first degree. This contention is based upon the theory that there was no evidence of premeditation and deliberation. In *People v. Eggers*, 30 Cal.2d 676, 686 [185 P.2d 1], it was held that no rule can be laid down as to the character or amount of proof necessary to show deliberation and premeditation, and that these elements of murder in the first degree may not be inferred from the killing alone, but are matters of fact, which cannot be implied as matters of law.

Murder is defined as "the unlawful killing of a human being, with malice aforethought." (Pen. Code, § 187.) To constitute murder in the first degree the homicide must have been perpetrated "by means of poison, or lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing," or committed in the perpetration of certain enumerated felonies. (Pen. Code, § 189.) ■ It is the exclusive province of the jury to determine from the evidence whether the killing was the willful, deliberate and premeditated act of the defendant. The sole question in this regard is whether the evidence is legally sufficient to support the verdict.

■ The words "deliberate and premeditated" have a well-defined meaning. (*People v. Bender*, 27 Cal.2d 164, 183 [163 P.2d 8].) They indicate generally a careful consideration and examination of the reasons for and against a choice

or measure; some plan thought out before the commission of the act, and a decision to act according to a plan.

█ From the evidence it appears that the decedent and defendant were not on unfriendly terms until a short time before the shot was fired. Someone suggested that they go into the alley to "settle their differences" and something about a fair fight. The subject of their differences, if any, was not in evidence. The deceased wore gloves, and assumed a fist-fighting position. One or two blows were struck. The witness Hill testified that deceased said something about "not pulling a knife"; that defendant "reached for something . . . toward his stomach . . . about belt high" and he saw a black object which looked like a gun, and the next thing he knew he heard a shot and started to run. In the absence of the evidence indicating a motive for the shooting, there was no substantial evidence that the defendant formed or entertained any previous ill will against the decedent or that the killing was deliberate and premeditated, as those terms are defined in *People* v. *Bender, supra.*

In *People* v. *Isby,* 30 Cal.2d 879, 890 [186 P.2d 405], the court, quoting from *People* v. *Wells,* 10 Cal.2d 610, 616 [76 P.2d 493], said: "[W]hen an unlawful killing" and " '*nothing further* is shown, the presumption of law is that it was malicious and an act of murder; but in such a case the verdict should be murder of the second degree, and not murder of the first degree.' " (See, also, *People* v. *Howard,* 211 Cal. 322, 329 [295 P. 333, 71 A.L.R. 1385].)

The judgment is modified by reducing it to murder of the second degree and as so modified is affirmed. The cause is remanded to the trial court with directions to pronounce judgment on the defendant sentencing him for the term prescribed by law for murder of the second degree. (*People* v. *Bender, supra,* p. 187; *People* v. *Howard, supra,* p. 330.)

The order denying a new trial is affirmed.

Barnard, P. J., and Mussell, J., concurred.