Filed 10/30/14  P. v. McClish CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H038137 |
| Plaintiff and Respondent, | (Santa Cruz County Super. Ct. No. F16676) |
| v. | |
| MICHAEL PATRICK MCCLISH, | |
| Defendant and Appellant. | |

In 2006, defendant Michael Patrick McClish was charged with killing his pregnant paramour Joanna "Asha" Veil after Veil threatened to expose their extramarital affair. Defendant was also charged with the killing of Veil's fetus.  Veil had stated her intention to seek financial support from defendant for her unborn child, which she believed defendant had fathered.  A jury found defendant guilty of first degree murder for the killing of Veil and second degree murder for the killing of her fetus.  (Pen. Code, § 187, subd. (a).)[1]  The jury found special circumstances of multiple murder.  (§ 190.2, subd. (a)(3).)  The jury also found allegations that defendant used a deadly and dangerous weapon to be true as to both counts.  (§ 12022, subd. (b)(1).)  The trial court sentenced

---

[1] Subsequent undesignated statutory references are to the Penal Code unless otherwise indicated.

defendant to life without the possibility of parole consecutive to 15 years to life consecutive to one year in prison.

On appeal, defendant claims the trial court erred by admitting testimony from a third party witness who testified that defendant had threatened to kill her if she told anyone she had had an affair with him.  Defendant further claims the court erroneously instructed the jury on the prosecution's burden of proof as to motive.  We conclude defendant's claims are without merit, and we will affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Facts of the Offense*

#### 1. *Overview*

In September 2006, defendant was a 37-year-old manager at the Ben Lomond Market (the Market) in Ben Lomond.  He also worked side jobs doing yard maintenance, removing trees, and cutting firewood at various locations around town.  He was married to Melissa Vernali; the couple had three young children.

Joanna "Asha" Veil, a 28-year-old cashier at the Market, had had an affair with defendant and believed she was pregnant with his child.  On September 9, 2006, she told a friend she planned to confront defendant concerning his responsibility for the unborn child.  Veil disappeared soon afterward.  Five days later, her dead body was found off the side of a road several miles from the Market.  The body had suffered blunt force trauma, and a rope was tied tightly around her neck.  Veil had been pregnant for about seven months at the time of her death; the fetus did not survive.  In May 2008, after nineteen months of investigation, defendant was charged with two counts of murder.

#### 2. *Defendant's Wife Melissa Vernali*

In 1995, at age 16, Vernali began working in the floral department of the Market. She met defendant when he was hired as the bakery manager, and they started dating while she was a junior in high school.  They married in 1998, and she bore children in 1998, 2000, and 2002.  Vernali quit working at the Market around 1997.

Defendant drank alcohol daily until March 5, 2006, at which time he quit drinking after a driving under the influence (DUI) conviction. After he quit drinking, defendant was "completely different," according to Vernali. He consistently informed Vernali of his plans or whereabouts, and he answered his phone or called her back right away. On dozens of occasions, Vernali told defendant she had a "one strike you're out policy" regarding their marriage. This meant that if she ever caught him cheating, she would take the children and leave him the first time it happened.

3. *Defendant's Affair With The Victim—Joanna "Asha" Veil*

In 2000, Veil moved to the United States from Poland. In 2004, she met Richard Veil in New York, and they moved to Santa Cruz where they were married. In 2005, Veil began working as a cashier at the Market, where she worked until the time of her disappearance. Phone records showed 30 phone calls between Veil and defendant between February 2006 and May 2006. As of September 2006, Veil was separated from her husband, and she was about seven months pregnant.

On September 7, Veil told a doula that she was not sure who fathered her unborn child, but suspected it was her boss at the Market because she had had an affair with him during her separation from Richard Veil. The doula testified that Veil described her boss as married with three children of his own, and that Veil said his name was "Mike or Mark or something."

Video footage from cameras at the Market showed that Veil was inside the Market at various times between 7:18 p.m. and 7:36 p.m. on September 9, 2006. Her timecard showed that she clocked out from her shift at 7:34 p.m. At 7:42 p.m., she called a friend while sitting in her car in the Market parking lot. Veil told the friend she was waiting to meet with defendant. She believed defendant was the father of her unborn child, and she planned to confront defendant to tell him she wanted to keep the baby. She planned to tell defendant she would obtain a paternity test, and if defendant was proven to be the father, she would seek financial support from him. While on the phone with her friend,

3

Veil practiced what she was planning to say to defendant. At the end of the call, she said she had to go because defendant had arrived.

4. *Defendant's Whereabouts on the Evening of September 9, 2006*

Defendant's time card showed that he clocked out of the Market at 5:43 p.m. on September 9, 2006. Around 7 p.m., after eating dinner at home, defendant told Vernali he needed to go back to the Market for some water. He stated: "I'll be five minutes. I'll be right back." At 7:19 p.m., after defendant did not immediately return home, Vernali called him to say she was putting the children to bed. Defendant did not answer his phone. Video footage taken from cameras at the Market showed defendant inside the Market at various times from 7:27 p.m. to 7:34 p.m. Vernali called him again at 7:40 or 7:45 p.m., and again defendant did not answer. He immediately tried to call her back, but the calls failed to complete.

At 7:58 p.m., defendant called Vernali again, and they spoke for two minutes. Defendant told her he had stopped at a nearby property on Glen Arbor Road to do some yard work. It was dark, but defendant told Vernali the property had motion sensitive lighting. The owner of the Glen Arbor property, who had hired defendant to do yard maintenance, testified that there were no motion sensitive lights on the property. The property owner also testified that the switches for outdoor lights were located inside a locked house, and she believed defendant had finished working there in July 2006.

Defendant called home at 8:48 p.m. to tell Vernali he was done working, and he returned home at around 9:00 p.m.

5. *Veil's Disappearance and the Discovery of Her Body*

Veil was scheduled to work on September 10 and 11, 2006, but she never arrived at the Market. The human resources director was concerned because Veil had always called in before missing work. But this time Veil never called, and she was not answering her phone. The director filed a report of a missing person on September 11, and the Market posted missing person flyers with Veil's photograph.

4

On September 14, a neighbor who had seen the flyers was walking her dog on Love Creek Road when she saw Veil's body lying 10 to 12 feet down a hill off the side of the road. It appeared the body had been dumped there. Veil's body was dressed in khaki pants and a maroon sweatshirt with the Market's logo. Detectives found a yellow polypropylene rope tied around Veil's neck with a complex knot that looked "something like a hangman's [k]not." There were several foxtails embedded in Veil's sweatshirt and socks, but there were no foxtail bushes in the immediate area. There was blood on Veil's hair and sweatshirt, and her face was bruised. The body was in a state of decay.

The pathologist who performed the autopsy estimated that Veil had been dead for five to seven days when her body was found. There was a three inch vertical fracture at the base of Veil's skull consistent with being struck by a heavy blunt instrument or falling onto concrete. The pathologist opined that Veil's death was caused by both the blow to her head and the rope around her neck. The fetus died from a deprivation of oxygen as a result of Veil's death. Postmortem DNA tests showed that Richard Veil was the biological father of the fetus.

6. *Defendant's Affair With Coworker Brandi Johnson*

Brandi Johnson worked as a checker at the Market for about a year starting in June 2004. She met defendant at the Market and started an affair with him that lasted until March 2006. Defendant frequently took her to various locations outdoors to have sex. These included a turnout off Old County Road above Ben Lomond, a turnout off Love Creek Road, and a cemetery in Felton. Defendant also introduced Johnson to his wife, and the two women became friends. Johnson spent substantial time at defendant's house, and the couple took Johnson with them on a vacation to Disneyland. Defendant and Johnson had sex during the Disneyland vacation.

Johnson became acquainted with Veil at the Market. Johnson was aware that Veil also spent time with defendant outside of work. In January 2006, when defendant's wife was out of town, defendant entertained both Johnson and Veil at his house. They drank

5

shots of Jagermeister chased with beer, and defendant drank whiskey. Johnson became jealous because Veil was "being very touchy feely" with defendant—tickling him and flirting with him while they were sitting on a couch. On other occasions, defendant told Johnson he was "hanging out" and drinking beer with Veil. He said he was drinking beer with her at the cemetery in March 2006 when he got his DUI.

Defendant ended his relationship with Johnson in March 2006 when he became aware of pictures showing them together. He told Johnson he could not continue seeing her because he was worried his wife, Vernali, would discover their affair.

Vernali testified that she suspected defendant was having an affair with Johnson. But Vernali did not want to acknowledge it, so when defendant denied it to her, she simply accepted his denials and did not press for the truth.

7. *Defendant's Relationship With Coworker Angela Haslam*

Angela Haslam began working at the Market as a cashier when she was 18 years old. In September 2006, she was working in receiving and stocking; defendant was her supervisor. She spent time with defendant outside of work at various outdoor locations where defendant did side jobs. They would "hang out and talk and drink." Haslam was acquainted with Veil because they both worked at the Market. In January 2006, Haslam met defendant at the cemetery in Felton, where defendant was working a side job. Veil arrived soon after. When Haslam left, Veil stayed behind. She was sitting on a bench drinking beer while defendant was working.

8. *Defendant's Conduct After Veil's Disappearance*

On September 12, 2006, a police officer interviewed defendant concerning Veil's disappearance. The interview took place at the Market. Defendant claimed that, except for work, he did not know Veil very well. He said he had worked on her vehicle and had given her a ride home from work, but "there's nothing else." The officer stated that he had spoken with Veil's pregnancy counselor, and that the counselor knew the identity of the baby's father. Defendant responded: "I was an alcoholic. You know, when you

6

drink sometimes things get cloudy." When the officer sought clarification, defendant stated: "Well, things happen when you are intoxicated." The officer again sought clarification, and defendant then denied that he had been intimate with Veil.

After defendant got home from work that day, he informed his wife there was a "rumor going around" that he was the father of Veil's baby. Defendant asked Vernali what she would do if the child was his "by some act of God." Defendant reminded her of his past problems with alcohol, including alcohol-induced blackouts, and he asked whether she would "stand by him no matter what." At the same time, defendant tried to reassure Vernali that the baby was not his. In response, Vernali reiterated her policy of "one strike you're out" regarding marital infidelity.

Defendant also told Vernali that the police had been interviewing managers at the Market regarding Veil's disappearance. Defendant then asked Vernali to lie about his whereabouts on the night of September 9. He asked her to tell people that he had been home splitting wood the entire evening. Defendant explained that he was not supposed to be driving because of his DUI conviction, and he wanted to prevent his extended family from discovering the conviction. Vernali testified that defendant had never asked her to lie about his whereabouts on any other occasion.

After work that day, defendant rinsed off his truck with a hose in the driveway of his residence. Vernali thought it was unusual because defendant did not regularly wash his truck. Defendant washed his truck again on September 13. He focused specifically on the right front passenger's side and the front bumper and hood area. Again, Vernali thought it was "very odd" because "he wasn't prone to washing it a whole lot to begin with and the fact that he was rinsing it out twice in two days was not normal." The next day, defendant used a power washer to wash his truck. Again, defendant concentrated primarily on the front of the truck, spraying the hood, the grill, and the front bumper. Defendant also pulled all of his tools out and completely emptied his truck to wash it.

7

On the morning of September 13, 2006, defendant met with Angela Haslam and told her police had questioned him about Veil's disappearance. Defendant said he had heard that Veil's roommates had told police he had had a relationship with Veil. Haslam testified that defendant "told me he doesn't know why her roommates would be saying that because, you know, he's never hung out with her outside of work and there was never you know, nothing was ever going on between them. And when I brought up the cemetery, how we had all hung out in the cemetery—I said, well, what about the time when we all hung out, you know. He said, well, I didn't tell [the police] that." Haslam asked defendant if he wanted her to lie to the police, and defendant responded: "I'm not asking you to lie but I'm just telling you that they don't know that[,] and I don't want them to know that I was ever in a secluded area with her."

Defendant also spoke with Brandi Johnson on September 13, 2006, concerning Veil's disappearance. Defendant told Johnson to "remember when I had your back, Brandi." According to Johnson, defendant was referring to a past incident in which someone had harassed and frightened her. In a stern tone of voice, defendant stated that "you, me and Asha never drank together and we weren't friends outside of work." Johnson knew that was false, but she responded affirmatively because she was afraid of defendant.

9. *Forensic Evidence Connecting Defendant To The Crime*

Forensic examinations of defendant's truck yielded several pieces of evidence connecting him to the crime. Vegetation and foxtails found in the truck tested positive for human blood. DNA extracted from the blood on one of the foxtails matched Veil's DNA at 13 loci. The chance of a random match with Veil's DNA was estimated at a one in 19 quadrillion for the Caucasian population. DNA extracted from blood on vegetation found on the driver's side floorboard matched Veil's DNA at 15 loci. The chance of a random match with Veil's DNA was estimated at a one in 21 quintillion for the Caucasian population. DNA extracted from blood on a foxtail near a gear shift also

8

matched Veil's DNA at 15 loci. Mitochondrial DNA from several hairs found in the truck matched Veil's maternal line. The chance of a random match with Veil's maternal line was estimated at one in 200. Defendant was ruled out as a source of the hair.

Investigators also found in defendant's truck small blue-green plastic particles consistent with particles from a polyethylene tarpaulin. Microscopic examination of the particles with several types of microscopes and instruments showed them to be indistinguishable from particles found on Veil's sweatshirt. Police seized several tarpaulins from defendant's property, but none matched the particles found on Veil.

Investigators also compared defendant's DNA to DNA found on the rope tied around Veil's neck. Defendant's DNA matched the DNA found on a piece of masking tape wrapped around the end of the rope. The prosecution's expert opined that only one in 123,000 persons from the general population could have contributed that DNA to the tape.

B. *Procedural Background*

On September 3, 2010, the prosecution charged defendant by information with two counts of murder. (§ 187, subd. (a).) Count One alleged the murder of Veil, and Count Two alleged the murder of Veil's fetus. As to both counts, the information alleged the special circumstance that defendant committed multiple murders. (§ 190.2, subd. (a)(3).) The information further alleged that defendant used a deadly and dangerous weapon—a rope—in the commission of both murders. (§ 12022, subd. (b)(1).)

On December 6, 2011, the jury found defendant guilty of first degree murder on Count One. On Count Two, the jury found defendant not guilty of first degree murder, but guilty of second degree murder. The jury found the special circumstance allegations that defendant committed multiple murders to be true as to both counts. The jury further found the allegations that defendant used a deadly or dangerous weapon to be true as to both counts.

9

On March 29, 2012, the trial court sentenced defendant on Count One to life in prison without the possibility of parole. On Count Two, the trial court imposed a consecutive sentence of 15 years to life. And based on the deadly weapon enhancement for Count One, the court imposed a consecutive sentence of one year. As to the deadly weapon enhancement on Count Two, the court stayed a one-year sentence under section 654. The court ordered the sentences to run consecutive to a separate sentence defendant was already serving for a prior, unrelated offense.

## II. DISCUSSION

### A. *The Trial Court Did Not Err In Admitting Brandi Johnson's Testimony Concerning Defendant's Threats to Kill Her*

Defendant claims the court erred in admitting testimony by Brandi Johnson that defendant had repeatedly threatened to kill her if she revealed their affair to anyone. Defendant contends admission of the evidence violated Evidence Code sections 352 (section 352) and 1101 (section 1101). Alternatively, he contends that, even if the evidence was admissible to show motive under subdivision (b) of section 1101, the court erred by instructing the jury that it could consider the testimony as evidence of planning. He argues that the errors were prejudicial under state law and further violated his federal due process rights, thereby requiring reversal under both *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*) and *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). The Attorney General argues that the trial court acted within its discretion because the evidence was probative of intent, motive, and planning under section 1101, subdivision (b). The Attorney General further contends the evidence was not unduly prejudicial under section 352.

We conclude the trial court did not abuse its discretion by admitting the contested testimony. We further conclude the court properly instructed the jury on the limited purposes for which the evidence could be used.

10

1. *Brandi Johnson's Testimony*

Brandi Johnson testified that, in the course of her affair with defendant, he told her on several occasions "that if I [(Johnson)] ever said anything to anybody that my kids wouldn't have a mom and he also told me that he can kill me and nobody would find me." On further questioning, she added that "He just said that I can disappear, keep my mouth shut." Depending on his mood, defendant sometimes said it in an aggressive manner, but sometimes he said it in a "lax kind of almost joking manner but he was not joking." Johnson testified that defendant said he wanted to keep the affair secret because "his family was everything to him. He had always said that nobody or nothing would come between him and his family and nobody would take his kids away from him." Both defendant and Vernali told Johnson that if Vernali ever discovered he had been unfaithful, she would take the kids and leave him.

The prosecution moved in limine to admit this testimony under section 1101, subdivision (b) as evidence of defendant's motive, plan, and intent. The prosecution further argued that the evidence was not made inadmissible under section 352 because its probative value was not substantially outweighed by the danger of undue prejudice. Defendant opposed the motion on the grounds that the proffered testimony constituted impermissible character evidence and presented a danger of prejudice, confusion, and undue consumption of time under section 352.

The trial court found the evidence to be "highly probative on the issues of the defendant's motive and intent" under section 1101, subdivision (b) and it granted the prosecution's motion in a written order. But when granting the motion, the court proposed a limiting instruction based on CALCRIM No. 375. Defendant argued that the jury should only be allowed to consider the testimony as evidence of motive. The prosecution argued that the jury should also be allowed to consider the evidence with respect to identity and intent, including defendant's planning as evidence of premeditation. The defense objected that instructing the jury that it could consider the

11

testimony for purposes other than motive would be "bringing improper 1101 evidence in through the backdoor." The court ruled that the testimony could be considered for purposes of establishing motive and a plan, and it gave a limiting instruction.

Consistent with CALCRIM 375, the court instructed the jury as follows: "The People presented evidence of other behavior by the defendant that was not charged in this case, namely that the defendant threatened to kill Brandi Johnson if she revealed their affair. You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed this uncharged act. Proof by a preponderance of the evidence is a different burden of proof than proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. If the People have not met this burden, you must disregard this evidence entirely. If you decide that the defendant committed this uncharged act, you may, but are not required to, consider that evidence for the limited purpose of deciding whether or not the defendant had a motive to commit the offenses alleged in this case and/or the defendant had a plan to commit the offenses alleged in this case. Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime. If you conclude that the defendant committed the uncharged act, that conclusion is only one factor to consider along with all of the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the charged crimes or any lesser included offenses or that the special allegation has been proved. The People must still prove each charge and each special allegation beyond a reasonable doubt."

2. *Legal Principles*

" 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) But a theory of relevance that depends on a defendant's character

12

traits or propensity to engage in certain conduct is generally impermissible. Under section 1101, "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).) Instead, under subdivision (b) of section 1101, evidence of prior conduct is admissible "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act." "It is the prosecutor's burden at trial to prove a defendant's prior misconduct by a preponderance of the evidence." (*People v. Hawkins* (2002) 98 Cal.App.4th 1428, 1444.)

Under section 352, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) "When evidence of prior offenses is presented to a jury, there is inherent danger of prejudice to an accused. Therefore, such evidence should be received with caution and admitted only when its probative value outweighs its prejudicial effect." (*People v. Evers* (1992) 10 Cal.App.4th 588, 599.)

3. *Standard of Review*

"We review for abuse of discretion a trial court's rulings on relevance and admission or exclusion of evidence under Evidence Code sections 1101 and 352." (*People v. Cole* (2004) 33 Cal.4th 1158, 1195.) "A trial court has broad discretion in determining whether to admit or exclude evidence objected to on the basis of section 352 [citation], and rulings under that section will not be overturned absent an abuse of that discretion [citation]. '[T]he term judicial discretion "implies absence of arbitrary

13

determination, capricious disposition or whimsical thinking." ' [Citation.] '[D]iscretion is abused whenever the court exceeds the bounds of reason, all of the circumstances being considered.' [Citation.]" (*People v. Mullens* (2004) 119 Cal.App.4th 648, 658.)

4. *Admission of the Testimony Did Not Constitute an Abuse of Discretion*

Evidence of prior bad acts may be relevant to prove motive and intent, and under the express terms of section 1101, subdivision (b), such evidence is not prohibited if offered for those purposes. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402, superseded by statute on other grounds, as stated by *People v. Britt* (2002) 104 Cal.App.4th 500, 505; *People v. Kelley* (1997) 52 Cal.App.4th 568, 579.) Evidence of motive is particularly probative when the identity of the offender is in dispute: "Considerable latitude is allowed in the reception of evidence on the question of motive. It is settled that evidence having a direct tendency, in view of the surrounding circumstances, to prove motive on the part of a person to commit the homicide, and thus to solve a doubt [. . .] as to the identity of the slayer [. . .] is admissible, however discreditably it may reflect upon the defendant, and even where it may show him guilty of other crimes." (*People v. Gonzales* (1948) 87 Cal.App.2d 867, 877-878.)

Here, the identity of the killer was a central issue at trial. The prosecution presented no eyewitnesses to the killing. Veil's body was not discovered until several days after her death, and it appeared the killer had moved her body from the original location of the killing. Without direct evidence placing defendant at the time and place of the killing, the prosecution had to rely on other evidence to establish the identity of the killer. Johnson's testimony was highly probative to the issue of identity because it singled out defendant as having a subjectively compelling motive to kill Veil. Johnson testified that defendant's wife had threatened to take the couple's children and leave him if she discovered his infidelity. Vernali's testimony corroborated this assertion. Moreover, Veil's pre-disappearance phone call to her friend showed that she intended to seek a paternity test and financial support from defendant—demands that would have

14

made it very difficult for defendant to continue hiding his infidelity from his wife. The jury could reasonably infer that defendant's desire to avoid familial dissolution was so great that he was willing to kill his numerous paramours to avoid it—and therefore that defendant was the unidentified killer. Accordingly, Johnson's testimony was relevant and probative as to motive, and was not prohibited under section 1101.

As for the analysis under section 352, we agree with defendant that the evidence presented some danger of prejudice. There is some possibility that the jury could have perceived defendant as a "bad person" with a propensity for violence towards women. Or jurors could have been emotionally influenced by their dislike for defendant. But the trial court gave the jury a limiting instruction consistent with CALCRIM 375, admonishing them not to consider the testimony for character purposes. Absent a showing to the contrary, we presume the jury followed the court's instructions. Furthermore, prejudicial evidence is admissible under section 352 unless "its probative value is *substantially outweighed* by the probability that its admission will [. . .] create substantial danger of undue prejudice." (Evid. Code, § 352.) (Italics added.) Given the highly probative nature of the testimony as to motive and identity, we conclude that the danger of undue prejudice did not substantially outweigh its probative value.

Defendant argues that Johnson's testimony was cumulative under section 352 because Vernali's testimony alone was sufficient to establish that defendant was motivated by a fear of familial dissolution. But Vernali simply testified about what *she told* defendant she would do if she caught him in an act of infidelity; she never testified about defendant's own subjective state of mind—i.e., that he actually believed her. Moreover, Vernali never testified that defendant was so motivated by the threat of her departure that he was *willing to kill to avoid it*. Johnson's testimony stood alone on this point, and it was therefore not cumulative. Defendant nonetheless contends that he never killed or assaulted Johnson, and that she continued with their affair notwithstanding his threats. But Johnson never threatened to expose their affair, and defendant ended the

15

affair when exposure loomed. None of defendant's arguments diminishes the probative value of Johnson's testimony. Accordingly, we conclude the trial court did not abuse its discretion by admitting the evidence under section 1101, subdivision (b) and section 352.

5. *The Jury was Properly Instructed on Johnson's Testimony*

Defendant also contends that the court erred by instructing the jury that it could consider Johnson's testimony as evidence of planning by defendant. The Attorney General argues that the jury was properly instructed because the evidence was relevant and probative to show planning and premeditation.

To prove first degree murder, the prosecution had to prove the killing was premeditated beyond a reasonable doubt. "An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse." (*People v. Stitely* (2005) 35 Cal.4th 514, 543.) "A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.] 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance. [Citations.] 'The process of premeditation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . ." [Citations.]' " (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.) Evidence of "planning activity" is relevant to show premeditation. (*People v. Anderson* (1968) 70 Cal.2d 15, 26-27.) Planning activity consists of facts about how and what the defendant did before the killing that show the defendant was engaged in activity directed toward, and intended to result in, the killing. (*Ibid.*)

Evidence of a prior bad act is not inadmissible under section 1101, subdivision (b) if the evidence is relevant to establish the existence of a common plan or scheme that defendant utilized in the instant offense. (*People v. Ewoldt*, *supra*, 7 Cal.4th at p. 394.) In contrast to prior bad acts offered to show intent, prior acts must have a higher degree

16

of similarity to the instant offense when offered to show the existence of a common plan. "[I]n establishing a common design or plan, evidence of uncharged misconduct must demonstrate 'not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.' " (*Id.* at p. 402 [quoting 2 Wigmore, Evidence (Chadbourn rev. ed. 1979) § 302, p. 249].)

The Attorney General argues that defendant's threats to Johnson show a high degree of similarity to his conduct in the killing of Veil because he threatened that Johnson would "disappear" and "nobody would find [her]." Similarly, Veil's body was dumped in a remote location hidden from view. But this theory of similarity departs somewhat from the traditional "common plan" theory set forth above. The prior bad act here is the *making of the threat*; but there is no evidence that defendant made similar threats to Veil. Rather, the Attorney General's contention is that the *content of the threat* to Johnson shows defendant had a preexisting plan to kill and hide the body of any paramour who exposed him—a plan he carried out when Veil threatened to expose his infidelity. Under this theory, the threat to Johnson would be evidence of premeditation in the murder of Veil because it would show the defendant considered his course of action well in advance of the crime. (See *People v. Lang* (1989) 49 Cal.3d 991, 1015 [defendant's prior threat could reasonably be interpreted to mean he had a preexisting intent to kill anyone who interfered with him or thwarted his plans or desires].) But this argument runs dangerously close to a theory of relevance made impermissible under subdivision (a) of section 1101—that defendant had a propensity or predisposition towards such conduct. Thus, while the Attorney General's argument establishes the probative value of the testimony as to planning and premeditation, admission of the evidence for that purpose increased the danger that the jury might employ it improperly. However, the trial court properly instructed the jury not to consider the testimony as "evidence that the defendant has a bad character or is disposed to commit crime." Given

17

this limiting instruction, we conclude that the trial court did not err by instructing the jury that it could consider Johnson's testimony as evidence of planning by defendant.

Even were we to assume that the trial court's instruction was erroneous, defendant cannot show he was prejudiced by the asserted error. For the reasons set forth above, the court properly admitted the testimony for the purpose of showing motive, and the court properly instructed the jury that it could not consider the testimony for character purposes. The asserted error here concerns only the instruction allowing the jury to consider the testimony as evidence of planning. To establish prejudice under *Watson*, defendant must show a reasonable probability of a more favorable outcome in the absence of this instruction—in other words, that the jury would have decided differently if they had not been given the contested instruction on planning, even though jurors were allowed to consider the evidence for purposes of establishing motive.

Defendant cannot establish a reasonable probability of a more favorable outcome under these circumstances. The evidence against him was strong. In addition to establishing motive, the prosecution presented abundant circumstantial evidence of his guilt. Video showed him at the Market with Veil just prior to her disappearance. His conduct immediately after her disappearance—washing his truck multiple times, and prompting three witnesses to lie for him—showed consciousness of guilt even before police discovered that Veil had been murdered. Furthermore, forensic evidence showed Veil's blood and hair was in defendant's truck, and his DNA was found on the masking tape wrapped around the end of the rope that was used to murder Veil. Defendant contends there was some danger of contamination in the DNA analyses, but the jury was unlikely to rule out several separate DNA matches on this basis. None of this evidence would have been any less forceful if the jury had been instructed that it could only consider Johnson's testimony for purposes of motive but not planning.

Defendant argues that the asserted error was so unfair that it constituted a violation of his federal due process rights, thereby requiring harmless error analysis under

18

*Chapman*.  We disagree.  Even assuming the instruction was erroneous, it would not have "so infused the trial with unfairness as to deny due process of law."  (*Estelle v. McGuire* (1991) 502 U.S. 62, 75.)  But even under *Chapman*, the evidence against defendant was so strong that we would conclude any error was harmless beyond a reasonable doubt. Accordingly, we conclude defendant's claim lacks merit.

B.  *The Trial Court Properly Instructed the Jury on Motive*

Defendant contends the trial court erred by instructing the jury that the prosecution was not required to prove motive.  Defendant argues that motive was an "intermediate fact" essential to a finding of guilt, and that the instruction thereby lowered the prosecution's burden of proof to something less than guilt beyond a reasonable doubt. Finding no legal authority to support this claim, we conclude the trial court properly instructed the jury.

The trial court instructed the jury consistent with CALCRIM No. 370 as follows: "The People are not required to prove that the defendant had a motive to commit any of the crimes charged.  In reaching your verdict you may, however, consider whether the defendant had a motive.  Having a motive may be a factor tending to show that the defendant was guilty.  Not having a motive may be a factor tending to show that the defendant is not guilty."

It is well established that motive is not an element of the offense of murder, and therefore that the prosecution has no burden to prove motive.  The California Supreme Court has stated that "evidence of motive is not required to establish intent to kill. . . ." (*People v. Smith* (2005) 37 Cal.4th 733, 741.)  And it has said that "motive is not an element.  [. . .]  Motive describes the reason a person chooses to commit a crime.  The reason, however, is different from a required mental state such as intent or malice." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 504.)

Defendant contends:  "When an intermediate circumstantial fact, such as motive, is essential to an inference of guilt beyond a reasonable doubt, then, as a matter of logic

19

as well as law, the subsidiary fact itself must be proved beyond a reasonable doubt." Defendant bases his argument on *People v. Anderson* (2001) 25 Cal.4th 543 (*Anderson*) and *People v. Wright* (1990) 52 Cal.3d 367 (disapproved on another ground by *People v. Williams* (2010) 49 Cal.4th 405). These cases concerned the proper consideration of circumstantial evidence. In *Anderson*, the court considered CALJIC 2.01, by which a trial court may instruct the jury that "each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance on which the inference necessarily rests must be proved beyond a reasonable doubt." But defendant presents no authority for the proposition that motive is a "fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt." Nor does defendant present any argument based on the facts of this case establishing that motive was an essential fact in proving his guilt. While evidence of defendant's motive may have persuaded the jury that he was more likely to be guilty, nothing about the circumstances of the offense rendered the fact of motive logically necessary to prove defendant's guilt.

Furthermore, the court properly instructed the jury consistent with CALCRIM No. 224—the CALCRIM counterpart to CALJIC 2.01—as follows: "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved you must be convinced that People have proved each fact essential to that conclusion beyond a reasonable doubt."

We conclude the trial court properly instructed the jury with CALCRIM No. 370 and CALCRIM No. 224. (*People v. Howard* (2008) 42 Cal.4th 1000, 1024 [instruction based on CALCRIM No. 370 did not lessen the prosecution's burden of proof].) Defendant's claim is without merit.

20

**DISPOSITION**

The judgment is affirmed.

_____
Márquez, J.

WE CONCUR:


_____
Bamattre-Manoukian, Acting P. J.




_____
Grover, J.